His Excellency Vincente CUESNONGLE, et al., Plaintiffs, Appellees,

v.

Hector RAMOS, Secretary of the Department of Consumer Affairs of Puerto Rico, Defendant, Appellant.

No. 82–1904.

United States Court of Appeals, First Circuit.

Argued May 2, 1983.

Decided Aug. 10, 1983.

Gerardo Mariani, Asst. Sol. Gen., Dept. of Justice, San Juan, P.R., with whom Miguel Pagan, Acting Sol. Gen., Dept. of Justice, San Juan, P.R., was on brief, for defendant, appellant.

Luis R. Davila-Colon, San Juan, P.R., with whom Hans H. Hertell, David C. Indiano, and Law Offices of Hertell & Davila, San Juan, P.R., were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, ALDRICH, Circuit Judge, and BONSAL,* District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

As in *Surinach v. Pesquera de Busquets,* 1 Cir., 1979, 604 F.2d 73, this is a suit seeking

---

* Of the Southern District of New York, sitting by designation.

to have declared unconstitutional an action taken by the Secretary of the Department of Consumer Affairs of Puerto Rico (DACO), established by Law No. 5 of April 23, 1973, 3 L.P.R.A. Secs. 341a–341v, as an improper entanglement between church and state. In *Surinach* the matter of religion was conceded; the issue was the degree of interference, which we found excessive. Here there is no question that there was interference; the issue is religion. Plaintiffs seeking First Amendment protection are Universidad Central de Bayamón (UCB) and various individual officers and representatives thereof. Incorporated under the laws of the Commonwealth, UCB is a co-educational, private, non-profit, liberal arts Catholic University, conducted under the auspices of the Order of Dominican Fathers. The facts having been stipulated, the district court ordered summary judgment for plaintiffs, and the Secretary appeals.

It appears that at the beginning of the academic year in August, 1980, certain non-teaching employees of UCB went on strike and were actively supported by some of the students. As a result, some classes were abruptly interrupted, the institutional order of UCB was at times disrupted, and disciplinary action was brought against certain students, resulting in suspensions. Among the factors contributing to the discontent of some students were the closing of courses and the absence of some professors, but "the main determining factor was the students' solidarity toward the striking employees." Although classes were to have commenced on August 16, they did not begin until August 25, when the academic program began without further incidents. After the strike ended, some students filed complaints against UCB before the Commonwealth's Council of Higher Education, claiming that the University had incurred violations in breach of contract, and, thus, of its license. These complaints were dismissed by the Council. Thereafter, in November, 1980, some of these students, along with others, filed similar complaints before DACO, alleging breach of contract.

The averments of breach of contract in the complaints to DACO were that UCB had violated its contractual commitments in 1) changing twice the date for the first day of classes of the first semester for the academic year 1980–81; 2) closing several sections of courses and ordering a new program of classes; 3) discharging twelve employees; 4) the reduction of student services; 5) the administrative substitution of professors; 6) the denial of a petition for the celebration of a student assembly; 7) the hiring of allegedly non-qualified professors; 8) the suspension of students for disciplinary reasons; 9) an alleged lack of adequate library and student center facilities; 10) refusing to reimburse the registration fees after the students voluntarily withdrew from their courses during the month of November, 1980; 11) violating its own by-laws in regard to disciplinary procedures; and 12) charging a $40 fee for activities allegedly not held.

When the complaints came on for hearing, UCB challenged DACO's jurisdiction on First Amendment grounds, and, upon being overruled, withdrew from the proceedings. Evidence was then presented on behalf of the complainants. Thereafter DACO dismissed the complaints of those students who had assisted the strikers, saying they had brought their troubles upon themselves, but decided in favor of one Montfort, who had not participated. DACO found,

. . . . .

5. Due to labor related problems at the beginning of classes, several class sections at the "Universidad Central de Bayamón" were closed due to lack of professors, causing several problem to the students, especially to those candidates for graduation.

6. Complainants were affected by the aforementioned problems in the following manner:

A. *Froilan Montfort Seijo*

Registered in five (5) classes or 15 credits. Two of his classes were cancelled, one of them being statistics 202, a graduation requisite. He attended classes during the first month, but there were no professors in the classroom.

. . . .

Student Froilan Montfort Seijo who was not suspended, tried to withdraw his registration, but was advised not to do so by the Registrar's Office, where he was told about a prompt normalization of the situation.

Continuing, after taking note that prior complaints to the Commonwealth's Council of Higher Education had been dismissed on the ground that UCB had not violated the By Laws for the Issuing of Licenses for Post-Secondary Private Education Institutions, with the comment that no complaint of contract violation or request for return of fees had been made there, DACO ruled that Montfort, "having paid his registration fees, expected to be rendered some particular services," and ordered the fee's return for breach of contract.

This case is not *Surinach.* UCB is not similar to a parochial school, with all that that implies. One has only to read the learned language of Mr. Justice Negron Garcia in the case of *Academia San Jorge v. Aponte Rosario,* 1980, 110 D.P.R. 193, 196, 204 (concurring opinion) to observe the vital differences. UCB is a separately incorporated institution, whose certificate states that its "objectives and purposes to take place, promote or realize are the creation and operation of institutions dedicated to university education, under the direction of its Board of Directors, . . . " and is affiliated with the Church, rather than operated by it. Rather than being an arm of the Church, its catalogue states, under the heading

GENERAL CHARACTERISTICS

Bayamon Central University is a private, nonprofit co-educational, liberal arts institution denominationally affiliated with the Roman Catholic Church, and the Dominican Order, but hierarchically independent of any ecclesiastical or religious structure. The University is at the same time ecumenical in concept, and welcomes students of all denominations and faiths.

RELIGIOUS ACTIVITIES

The University is affiliated with the Catholic Church but seeks students with a variety of religious backgrounds. A Chaplain of the University and the Dean of Students are in charge of the religious activities of the student body. Regular masses are held daily in the Catholic Church of the Dominican Order adjoining the campus. . . . .

Attendance at religious services is optional . . . . Students of other faiths are encouraged to attend services wherever they desire.

█ This is different from a true parochial school, which not only is run directly by the Church, but has attributes such as integration of secular and religious education, mandatory religious instruction, religion based admissions policies, has as a central purpose the inculcation of religious values, prepares students for a religious career, with other similar features. These sorts of schools are deemed pervasively sectarian. *See Meek v. Pittenger,* 1975, 421 U.S. 349, 356, 364–66, 95 S.Ct. 1753, 1758, 1762–63, 44 L.Ed.2d 217; *Lemon v. Kurtzman,* 1971, 403 U.S. 602, 616–20, 91 S.Ct. 2105, 2113–14, 29 L.Ed.2d 745, *Catholic Bishop v. NLRB,* 7 Cir., 1979, 559 F.2d 1112, 1122, *aff'd,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533. And where a pervasively sectarian school is concerned, DACO's interference would more readily entangle government excessively in the affairs of religion and have a primary effect of inhibiting religion. *Compare Surinach v. Pesquera de Busquets,* ante. UCB, however, is a true liberal arts university, giving Bachelor of Arts degrees in many disciplines, Bachelor of Science, and of Business Administration. For "religious training," there is a liberal arts requirement of 6 (out of a total of 97) credits in theology. However much some of its high officers and a small percentage of its teachers are priests devoted to the principles and concepts of the Catholic Church, UCB is not primarily carrying on a religious activity in the First Amendment sense. *See Roemer v. Board of Public Works,* 1976, 426 U.S. 736, 755–59, 96 S.Ct. 2337, 2349–51, 49 L.Ed.2d 179; *Hunt v. McNair,* 1973, 413 U.S. 734, 743–44, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923; *Tilton v. Richardson,* 1971, 403 U.S. 672, 680–82, 91 S.Ct. 2091, 2096–97, 29

L.Ed.2d 790. As the scheduling decisions resulting in DACO's challenged actions were totally unrelated to any religious aspects of UCB's mission, and as there is no evidence UCB's religious affiliation prompted DACO's actions, we see no violation of the Free Exercise Clause here.

This is not changed by an agreement entered into on August 5, 1980, between UCB and the Bishop-Cardinal of the Archdiocese of San Juan, by which UCB accepted an obligation to keep the faith and a "catholic education philosophy." It is true that, under Article 2, UCB "acknowledges the right of the Bishop to oversee the University according to the present canonical rule of 'servatis de iure servandis.'" Whatever this may mean, the answer for present purposes comes in the immediately ensuing sentence.

> "This right to oversee is understood not to extend to matters which usually fall within the university administration competency."

Our conclusion that there is no merit to a claim that DACO's actions here interfere unconstitutionally with any religious activity is not the end of the case. Although UCB argued only the religion clause of the First Amendment, we are disturbed by the possible abuse of freedom of speech, an issue we noted, but found unnecessary to reach in *Surinach v. Pesquera de Busquets,* 604 F.2d, ante, at 74 n. 2. Since today we uphold DACO on the religion issue, we feel compelled at least to note that seems an important public matter.

■ Teaching is speech. *See, e.g., Keyishian v. Board of Regents,* 1967, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629; *Keefe v. Geanakos,* 1 Cir., 1969, 418 F.2d 359. *See also Tinker v. Des Moines Indep. Community School Dist.,* 1969, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731; *James v. Board of Education of Central Dist. No. 1.,* 2 Cir., 1972, 461 F.2d 566, *cert.*

*denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491. In *Keefe,* ante, we dealt with the attempt by a school committee to dismiss a high school teacher for using in his senior English class an article from the Atlantic Monthly magazine containing an obscene word. We stated:

> "We accept the conclusion of the court below that 'some measure of public regulation of classroom speech is inherent in every provision of public education.' But when we consider the facts at bar as we have elaborated them, we find it difficult not to think that its application to the present case demeans any proper concept of education. The general chilling effect of permitting such rigorous censorship is even more serious." *Keefe v. Geanakos,* 418 F.2d, ante, at 362.

In *Keyishian,* 385 U.S., ante, at 603, 87 S.Ct. at 683, the Court stated,

> "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers involved. That freedom is therefore a special concern of the First Amendment . . . ."

And again, in *Shelton v. Tucker,* 1960, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231, the Court stated,

> "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."

■ These decisions establish a zone of First Amendment protection for the educational process itself, which, in proper circumstances, must include not only students and teachers, but their host institutions as well. *Cf. Pierce v. Society of Sisters,* 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070. Although simply requiring a miniscule cash repayment [1] the state, through an administrative agency, has taken the large step of supervising the conduct of basic university

---

1. This opinion should not be read to imply that students could never obtain repayment of improperly obtained fees. For example, in *Samuel v. University of Pittsburgh,* 3 Cir., 1976, 538 F.2d 991, the court ruled that defendant universities had unconstitutionally classified female students as out-of-state residents based on their husbands' domiciles, and thereby had illegally charged them excessive tuition fees. The court also ruled that plaintiffs were entitled to reimbursement of the overcharges under the equitable doctrine of restitution.

affairs by determining that UCB has broken a highly complex relationship and agreement with its students as if it were a simple commercial contract to build a house. It is far from that. We have already recited the matters the students asserted they had a right to complain about. They are in reality no different from the issues DACO actually passed upon, that classes were late in starting, and that, with respect to Montfort, "two (2) of his classes were cancelled and in others, the teachers were changed in more than one occasion." DACO did not even do this correctly. Although it recognized that "the University's Catalogue . . . is the Law among the parties," in holding that Montfort was entitled to rescind because he did not receive what he "expected," it ignored altogether the catalogue's many recitals of "expectation."

Thus,

"Academic Calendars are subject to change without notice.

"The University reserves the right to revise or change rules, charges, fees, schedules, courses, requirements for degrees and any other regulations affecting students whenever considered necessary or desirable.

". . . The University reserves the right . . . to cancel any course for insufficient registration and to phase out any program.

"Registration by students signifies an agreement to comply with all regulations of the University whenever approved."

DACO did not purport to consider these provisions unreasonable—indeed it could not; a university could not be run any other way—it simply ignored them. DACO also failed to consider how it was possible, given

these provisions, that the University or the students involved could possibly have had a "reasonable expectation" that the students had a contract right or any right to have classes start on time or any of their other claims. Yet our decisions, *see Lyons v. Salve Regina College,* 1 Cir., 1977, 565 F.2d 200, 202–03, *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62, as well as other courts' decisions, *Slaughter v. Brigham Young University,* 10 Cir., 1975, 514 F.2d 622, 626–27, *cert. denied,* 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131, mandate such a finding. In *Lyons,* ante, we stated that the standard for such disputes was "that of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Lyons v. Salve Regina College,* 565 F.2d, ante, at 202 (quoting *Giles v. Howard University,* D.D.C., 1977, 428 F.Supp. 603, 605). There, where a manual called for a three member grade appeals committee to make a recommendation to the dean, we held that the fact that the dean did not follow the recommendation of the committee was not a basis for the plaintiff to have the action set aside because nothing in the manual created a reasonable expectation that a recommendation by the committee was binding on the dean.

Even to think that a university could be found to have broken its contract when it changed the dates of classes, or the curriculum, for reasons beyond its control, or changed teachers, should startle anyone at all familiar with university life.[2] Indeed, it should surprise them even if the changes were simply a matter of voluntary internal policy, and they were held invalid by a court.[3] *See Bauza v. Morales Carrion,* 1

2. We regret that space does not permit reproduction of the entire article, "In Defense of Disorder," by Timothy S. Healy, S.J., President of Georgetown University, Newsweek, May 23, 1983, but we quote in part. "[O]ur critics . . . seem to think that universities are orderly places, and if they aren't, presidents and trustees ought to make them so, even by force. Force is, however, our last and least resource . . . ." *Apparently the representative of the* Commonwealth of Puerto Rico would say that if the university does not use force, but endeav-

ors to accommodate itself peaceably to disruption, all of its students can claim breach of contract.

3. *Cf. Wood v. Strickland,* 1975, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 ("The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and [42 U.S.C. § 1983] was not intended to be a vehicle for federal-court corrections of errors in the exercise of

Cir., 1978, 578 F.2d 447, 451–53 ("We think in general institutions may be presumed to reserve for themselves some degree of discretion in dealing with uncertain contingencies despite the fact that they have committed themselves to a formal and orderly procedure for regular decision-making activities."). *See also Mahavongsanan v. Hall*, 5 Cir., 1976, 529 F.2d 448, 450.

The constitutional issue, of course, is not the simple one of whether DACO was wrong, but the larger one of whether and to what extent a university, engaged in the highly important and complex enterprise of teaching, should properly be subject to state regulation by an administrative body established to protect consumers from defective products and "numberless undesirable practices that some merchants and manufacturers are performing . . . ." Statement of the Motives for creating Law No. 5 of April 23, 1973.[4] A body, moreover, subject to review only for errors of law and findings not supported by substantial evidence. *See* 3 L.P.R.A. § 341p(e). A system which would grant a right of review and state administrative control, to a less than judicial body, unless, possibly, to a specialized one, particularly qualified,[5] may raise First Amendment questions quite apart from religious interference. We have dwelt at length on the erroneousness of DACO's decision on the merits merely to point up its inability to comprehend the nature of the question that it faced. This inability, although quite understandable, is really the problem, or the beginning of it.

We do not, of course, wish to make a judgment on this issue without giving the parties full opportunity to be heard; however, it is too important a public matter to

overlook. We remand to the district court to permit an amendment to the complaint if plaintiffs are so minded, the injunction, meanwhile, to remain in effect. Thereafter the unsuccessful party may file a new appeal. Our present judgment is that plaintiffs' claim with respect to religion fails, and in this regard the judgment of the district court is reversed.

---

that discretion which do not rise to the level of violations of specific constitutional guarantees.").

4. "The new Department of Consumer Affairs shall be a specialized agency with technical and professional personnel highly qualified so as to vindicate aggressively and strongly the rights of the consumer; to face the inflationary trends of our market and to inspect undesirable marketing practices . . . ."

5. We note that in exercising authority, DACO chose to disregard the fact that UCB's conduct

had already been approved by a more appropriate administrative agency, the Commonwealth's Council for Higher Education. DACO dismissed the Council's action by saying no "contract violation" had been presented to it by the complainants. This was so mistaken that the Secretary frankly concedes in his brief that the students' complaints to the Council claimed "violations of breach of contract," and that, after dismissal, the students "filed similar complaints before [DACO]."