CONSEJO DE EDUCACIÓN SUPERIOR ET AL., demandantes y recurridos, *v.* UNIVERSIDAD INTERAMERICANA DE PUERTO RICO ET AL., demandados y recurrentes.

*Número:* RE-86-248 *Resuelto:* 23 de diciembre de 1987

*William Estrella*, abogado de los recurrentes; *Donato Rivera De Jesús* y *Luis Roberto Piñero*, abogados de los recurridos.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El Consejo de Educación Superior (C.E.S. o Consejo) presentó en el Tribunal Superior, Sala de San Juan, una petición de *injunction* al amparo de la Ley Núm. 31 de 10 de mayo de 1976 (18 L.P.R.A. secs. 2101–2109), para que se le prohibiera a la Universidad Interamericana de Puerto Rico (U.I.A.) poner en vigor el Programa de Maestría en Ciencias en Tecnología Médica (Maestría en Tecnología Médica) en el Recinto de San Germán.([1]) El foro de instancia emitió el *injunction* solicitado. Oportunamente la U.I.A. compareció ante nos mediante recurso de revisión. Acordamos revisar.([2])

I

*Hechos*

La U.I.A. sometió al C.E.S. una solicitud de enmienda a su licencia de autorización([3]) para que se incluyera en la misma un nuevo programa de Maestría en Tecnología Médica en el Recinto de San Germán. El Consejo procedió a constituir la Junta Consultiva (Junta)([4]) que se encargaría de

([1]) El tribunal de instancia permitió la intervención de la Asociación de Colegios y Universidades Privadas de Puerto Rico, Inc., como *amicus curiae*. Dicho *amicus curiae* participó plenamente en los procedimientos en instancia y ante este Tribunal.

([2]) El 29 de mayo de 1986 en auxilio de nuestra jurisdicción paralizamos la ejecución del *injunction*.

([3]) Debe entenderse que la enmienda que solicitó la Universidad Interamericana de Puerto Rico (U.I.A.) fue a su licencia de renovación (acreditación). Esta es la licencia que le otorga el Consejo de Educación Superior (C.E.S.) cada cuatro (4) años para que pueda continuar operando la institución.

La U.I.A., por estar acreditada al aprobarse la Ley Núm. 31 de 10 de mayo de 1976 (18 L.P.R.A. sec. 2101 *et seq.*), obtuvo "automáticamente una Licencia de Autorización, cuya renovación esta[ba] sujeta a las normas de acreditación aprobadas por el Consejo con arreglo a las disposiciones de la Ley Núm. 1 del 20 de enero de 1966, en su Artículo 3, Inciso G". Art. 9, Cap. IV, Reglamento para la Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria de 9 de junio de 1977. Art. 12 de la Ley Núm. 31 de 10 de mayo de 1976.

([4]) La Junta Consultiva se crea por mandato de la Ley de la Universidad de Puerto Rico, Ley Núm. 1 de 20 de enero de 1966, según enmendada por el Art.

evaluar el nuevo programa. Esta Junta visitó la U.I.A., entrevistó personal de la institución, estudió la documentación correspondiente y preparó su informe de hallazgos. La U.I.A., a su vez, sometió a la Junta un informe de reacción al informe antes indicado. Luego del estudio correspondiente, la Junta emitió su informe final en el cual detalló las conclusiones finales y recomendaciones al Consejo. Una vez recibido el informe y las recomendaciones del Comité de Licencia y Acreditación, el Consejo en pleno denegó la solicitud de enmienda a la licencia. Tras ser notificada de esta decisión la U.I.A. solicitó vista administrativa. En esta vista le indicó al Consejo que se diera por notificado del programa, permitiera su comienzo e hiciese la evaluación dentro de los dos (2) años de su inicio. El Consejo denegó esta solicitud y reiteró su decisión original.[5] El Consejo también denegó una solicitud de reconsideración planteada por la U.I.A. De la decisión en que el C.E.S. se negó a autorizar el programa, la U.I.A. no recurrió en revisión judicial al Tribunal Superior.

Así las cosas, la U.I.A. presentó una "Moción Informativa, Aclaratoria y Solicitud de Reconsideración de Evaluación" en la cual solicitó que se le tuviera por desistida de su solicitud de autorización o enmienda de licencia e informó

---

3(g)(3) de la Ley Núm. 27 de 11 de 1978 (18 L.P.R.A. sec. 602(g)(3)). Esta Junta la integran el Secretario de Instrucción Pública o su representante y educadores seleccionados de entre los miembros de instituciones privadas de educación universitaria existentes en Puerto Rico debidamente acreditadas y de la Universidad de Puerto Rico. El Consejo al determinar la composición de la Junta toma en consideración la naturaleza y complejidad de la institución a ser acreditada. Se excluye de la Junta a los miembros que correspondan a la institución sujeta a evaluación. Reglamento sobre Acreditación de Instituciones Privadas de Educación Superior en Puerto Rico de 15 de septiembre de 1967, Cap. II, Arts. 4 al 6.

Luego del trámite de evaluación de la Junta, el Consejo obtuvo el asesoramiento del Dr. A.A. Cintrón Rivera, perito en la materia bajo estudio. El doctor Cintrón estudió los informes de la Junta y su recomendación al Consejo también fue desfavorable a la aprobación del programa.

[5] Art. 5 de la Ley Núm. 31 de 1976 (18 L.P.R.A. sec. 2105).

que procedería a comenzar el referido programa independientemente de las denegaciones previas. El C.E.S. en reunión extraordinaria decidió denegar la solicitud de desistimiento y le advirtió a la U.I.A. que debía abstenerse de comenzar o continuar ofreciendo el programa indicado, apercibiéndole que instaría la acción judicial correspondiente. La U.I.A. comenzó el Programa de Maestría en Tecnología Médica el 10 de marzo de 1986.(6)

El 17 de marzo de 1986 el C.E.S. presentó la petición de *injunction* ante el Tribunal Superior, Sala de San Juan.(7) Los demandados presentaron una contestación a la demanda y moción de desestimación en la que argumentaron que, a tenor con la Ley Núm. 31 de 1976, *supra*, el Reglamento sobre Acreditación de Instituciones Privadas de Educación Superior en Puerto Rico de 15 de septiembre de 1967 (Reglamento sobre Acreditación de 1967) y el Reglamento para la Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria de 9 de junio de 1977 (Reglamento sobre Licencias de 1977), la evaluación de un nuevo programa de estudio por el C.E.S. no tiene que hacerse antes de comenzar el programa. Puede hacerse mientras el mismo está en marcha. Adujeron, además, como defensa afirmativa entre otras,

---

(6) En la actualidad se sigue ofreciendo este programa. Del expediente surge que la U.I.A. informó a todos los estudiantes matriculados en el nuevo programa de Maestría de Ciencias en Tecnología Médica, que el C.E.S. les había notificado que no podían iniciar dicho programa. Les indicó que en su opinión el C.E.S. estaba equivocado y por eso iban a continuar ofreciéndolo, pero que "[s]i se suscitara una acción legal de parte del [C.E.S.] contra [la U.I.A.] que impidiese [su continuación], la [U.I.A. les] reembolsa[ría] la cantidad total pagada por concepto de matrícula". Apéndice, pág. 21. También informó que podían retirarse del programa si lo deseaban. Memorando de 27 de febrero de 1986 del Presidente Interino de la U.I.A., Dr. José Lema Moyá, a todos los Estudiantes Matriculados en el Programa de Maestría en Ciencias en Tecnología Médica.

(7) Demandaron a la U.I.A. y a sus entonces Presidente y Presidente Interino, Dr. Ramón A. Cruz y Dr. José Lema Moyá, respectivamente.

que el Art. 8 de la Ley Núm. 31 de 1976(⁸) no concede autoridad al C.E.S. para solicitar del tribunal un interdicto contra una institución que posee una licencia de acreditación, por el hecho de que esté ofreciendo un nuevo programa sin que el mismo haya sido previamente evaluado y autorizado por el C.E.S. De acuerdo con los demandados, el Art. 8, *supra*, se refiere exclusivamente a instituciones que operen sin licencia y la U.I.A. posee una licencia de acreditación.

Tras los trámites procesales de rigor y la celebración de una vista, el tribunal de instancia declaró con lugar la demanda del C.E.S. y le ordenó a la U.I.A. que cesara y desistiera, so pena de desacato civil, de ofrecer y operar el Programa de Maestría en Tecnología Médica, hasta que obtuviera la autorización correspondiente del Consejo.

En la sentencia, el tribunal de instancia determinó que como cuestión de hecho, en el pasado el C.E.S. ha permitido que se implanten nuevos programas en la U.I.A. y en otras instituciones privadas de educación postsecundaria sin la evaluación previa,(⁹) y en algunos casos los nuevos programas han continuado sin evaluación posterior. De igual

---

(⁸) Art. 8, Ley Núm. 31 de 1976 (18 L.P.R.A. sec. 2108), en su parte pertinente lee:

". . . En caso de que una institución educativa de las enumeradas en este Capítulo persista en operar sin licencia después de advertida sobre el particular por . . . el [C.E.S.] . . . [éste podrá] acudir al Tribunal Superior de Puerto Rico y obtener una orden de interdicto contra dicha institución, la que quedará sujeta a todas las consecuencias legales dispuestas por ley."

(⁹) Tomamos conocimiento judicial de *Fundación Educativa Ana G. Méndez v. Universidad de Puerto Rico*, R-85-157. En este recurso la Fundación Educativa Ana G. Méndez presentó una petición de sentencia declaratoria en la cual cuestionaba —a base de los mismos planteamientos de este caso— la actuación del C.E.S. de requerirle a las instituciones que componen la Fundación someterle a aquél los nuevos programas para evaluación previa. Distinto al caso de autos, la Fundación comenzó sus programas sin someterse a evaluación previa y el Consejo no trató de impedirlo judicialmente. A pedidos del C.E.S. desestimamos el recurso debido a que el mismo se había tornado académico. El C.E.S. renovó la licencia de la Fundación mediante el trámite ordinario de reacreditación. En ese procedimiento de reacreditación se evaluaron los nuevos cursos o programas que habían comenzado sin evaluación previa del C.E.S.

forma, en el pasado la U.I.A., en ocasiones, ha solicitado la evaluación previa del C.E.S. antes de comenzar nuevos programas. Concluyó como cuestión de derecho que como por ley las universidades privadas tienen que ser evaluadas para obtener la concesión de una licencia, igual requisito aplica para comenzar un nuevo programa o curso académico. Expresó que un resultado contrario frustraría "[e]l interés del Estado en la aprobación de la Ley 31 [de 1976, el cual] fue establecer una forma de supervisión de estas instituciones para provecho [tanto] de su matrícula como de la ciudadanía en general [y que e]ste interés nace del poder inherente del Estado para regular la calidad de la educación". Apéndice, pág. 93. No señaló, sin embargo, algún artículo en particular de los reglamentos aplicables o de la Ley Núm. 31 de 1976 que dispusiera expresamente el requisito de evaluación previa para comenzar nuevos cursos o programas en instituciones privadas que poseyeran licencia de acreditación. Tampoco determinó si el Programa de Maestría en Tecnología Médica de la U.I.A. constituía una nueva unidad académica o un cambio sustancial en los objetivos, campo de acción o control de la U.I.A. Art. 5(a), (b) y (c) del Reglamento sobre Licencias de 1977.

De esa sentencia recurre la U.I.A. y señala la comisión de ocho (8) errores, los cuales básicamente tienen que ver con la interpretación que el tribunal de instancia hizo de la Ley Núm. 31 de 1976, del Reglamento sobre Licencias de 1977 y del Reglamento sobre Acreditación de 1967, y con el planteamiento de censura previa.([10])

---

([10]) La U.I.A. alega que ella como institución es poseedora del derecho de libertad académica como una de las garantías de su libertad de expresión. Argumenta que el requisito de evaluación de los cursos antes de ponerlos en vigor constituye una censura previa. Véanse: *Cuesnongle* v. *Ramos*, 713 F.2d 881, 884 (1er Cir. 1983); *Keyishian* v. *Board of Regents*, 385 U.S. 589, 603 (1967); *Keefe* v. *Geanakos*, 418 F.2d 359 (1er Cir. 1969). También véase *Tinker* v. *Des Moines School Dist.*, 393 U.S. 503, 506 (1969). Similar planteamiento hace el *amicus cu-*

## II

*Introducción*

Este caso nos permite considerar si, bajo el esquema de licencia obligatoria creado por la Ley Núm. 31 de 1976, el C.E.S. tiene que inexorablemente requerir evaluación y autorización previa para que una institución educativa privada al nivel postsecundario que ha sido ya acreditada pueda iniciar un nuevo programa o curso.

Antes de comenzar nuestro análisis de la cuestión planteada es menester que hagamos algunas observaciones sobre el papel significativo que han desempeñado y desempeñan las universidades privadas en la educación de nuestro país. En la actualidad, en Puerto Rico, 158,620 estudiantes asisten a instituciones educativas de nivel postsecundario. De este total las universidades privadas educan 98,696, el 62.2%.[11]

El establecimiento de las universidades privadas ha permitido que la educación —uno de los pilares formativos del ser humano, e ingrediente esencialísimo en nuestro sistema socioeconómico cultural— alcance y nutra a un gran número de estudiantes que de otra forma quedarían desprovistos de

---

*riae* la Asociación de Colegios y Universidades Privadas de Puerto Rico, Inc. Debido al resultado a que llegamos no tenemos que entrar a discutir esta controversia.

Para una discusión sobre la libertad de enseñanza en Francia, Alemania, España e Italia, véase A. Embid Irujo, *Las Libertades en la Enseñanza*, Madrid, Ed. Tecnos, 1983.

[11] Estadísticas recopiladas por la Oficina de Estadísticas del C.E.S. para el Primer Semestre 1986-1987.

En relación con estas estadísticas debemos señalar que las mismas no incluyen institutos que están bajo la autoridad del Departamento de Instrucción Pública. El total de estudiantes en instituciones públicas al nivel postsecundario es de 59,924, lo que representa un 37.8% del total. En estas estadísticas se incluyen la Escuela de Artes Plásticas, el Conservatorio de Música, los Institutos Tecnológicos del Departamento de Instrucción, el Centro de Estudios Avanzados de Puerto Rico y el Caribe, y el Colegio Técnico del Municipio de San Juan.

ésta. Constituyen, pues, las universidades privadas nuevos y ricos caminos, avenidas y recursos a la disposición de seres humanos ávidos de recibir enseñanza, entrenamiento y formación en diversas disciplinas, oficios, habilidades y destrezas, con el propósito primordial de lograr un decente sustento y alcanzar altos niveles de superación personal, profesional y colectiva que redundarán, bien encauzados, en un saludable y duradero bienestar social.

Las universidades privadas son, en nuestro sistema, un alivio necesario para la universidad pública, que no puede en muchas ocasiones, por diversas causas y circunstancias, abrir sus puertas a personas interesadas en obtener o proseguir su formación educativa. Además, y aun de mayor relevancia e importancia, éstas constituyen nuevos foros para la libre discusión e intercambio de ideas, actividades y conducta innovadora, en muchas ocasiones, distintas a las de la universidad pública, con sabias aportaciones a nuestra sociedad. El contraste e intercambio de ideas y conceptos genera saludables debates que son la savia y esencia misma de toda sociedad democrática.

No se limita, pues, la educación a unos meros formalismos ni a vistosos ropajes desprovistos de profundidad y sabiduría interior, ni tampoco a unos débiles y a veces perezosos intentos de transmitir unos conocimientos con visos de autenticidad y certeza. Es mucho más que eso. Va dirigida y es parte consubstancial con la dignidad humana. Por ello está revestida de un enorme y transcendental interés público. De ahí que todo el proceso de evaluación del sistema educativo, en todas o algunas de sus fases, aunque necesario, es imprescindible hacerlo cuidadosamente, teniendo presente que hay que hacer un balance entre la necesidad de asegurarse que la institución está equipada y puede llevar a cabo su cometido educativo y el deber de fomentar foros para la creación de nuevas ideas, conceptos y tendencias. La implantación de la ley debe resguardar este delicado equilibrio, conservando en

las universidades privadas un ambiente de libertad y abstracción sustancial.

En *Sánchez Carambot* v. *Dir. Col. Univ. Humacao*, 113 D.P.R. 153, 159–162 (1982), expresamos el gran respeto y deferencia que se han ganado las instituciones universitarias debido a la importancia social de sus ejecutorias. Allí dijimos:

Nuestro derecho histórico es testigo fiel del gran reconocimiento social de que han disfrutado las instituciones universitarias, así como sus profesores y estudiantes: "Et otrosi decimos que los cibdadanos de aquel logar do fuere fecho el estudio deben mucho honrar et guardar los maestros, et los escolares et todas sus cosas. . .". *Las Siete Partidas del Rey don Alfonso el Sabio*, Madrid, Ed. Atlas, 1972, T. II. Partida Segunda, Título XXXI, Ley II. Nuestro aprecio jurídico por la universidad y sus valores de libertad y estudio es, pues, muy antiguo y se remonta a tiempos anteriores a la concepción del derecho constitucional moderno.

En la América de nuestro tiempo esa tarea destacada que desempeña *la universidad como centro de investigación, de estudio y de crítica social no ha perdido trascendencia.*

La universidad latinoamericana se ha visto comprometida desde sus comienzos con la reforma social. La universidad luchó por su autonomía, la que se cristalizó con la Revolución universitaria de Córdoba en 1918. Desde que comenzó la reforma se proclamó el deber universitario de asumir el liderato en la sociedad y de servir a sus necesidades, definiéndose así la ubicación en las tareas universitarias del estudio de lo político-social al margen de las preferencias del Estado. Así pues, *en Latinoamérica la autonomía universitaria se concibe como el santuario donde conseguir una relativa libertad en el examen de las ideas.* R. Mac-Lean y Esteríos, *La crisis universitaria en hispanoamérica*, Instituto de Investigaciones Sociales, Universidad Nacional, México, 1956.

En este sentido, el definitivo reconocimiento que las libertades civiles reciben en todo el ordenamiento nacional de sociedades como la nuestra, no puede ser razón hábil para menoscabar las garantías de libertad de expresión y asociación

que desde tiempos pretéritos gozan los estudiantes y profesores universitarios. Precisamente, para que las salvaguardas civiles no decaigan es imprescindible la crítica ilustrada, acuciosa y constante de parte de esos grupos dedicados al más elevado estudio. Callar sus denuncias puede poner en peligro las libertades que con tanta dificultad se plasmaron en un pasado no muy remoto. *Se trata,* como advertimos en *Rodríguez v. Srio. de Instrucción,* [109 D.P.R. 251 (1979)], *de proteger esa discusión enérgica de las ideas, que es tan esencial para el cabal desarrollo del hombre, como para la conservación y el sostenimiento del bienestar común en una sociedad que viva en democracia.* (Escolio omitido y énfasis suplido.) *Sánchez Carambot v. Dir. Col. Univ. Humacao,* supra, págs. 160–161.

██ Lo antes expuesto en *Sánchez Carambot v. Dir. Col. Univ. Humacao,* supra, tiene renovada vigencia en la presente controversia. Para que las universidades, bien sean las privadas o la del Estado, cumplan su función social de ser foro de "discusión enérgica de las ideas" mediante la investigación, el estudio y la crítica social, debemos velar por que se les asegure "una relativa libertad en el examen de las ideas". Íd., pág. 161. En este caso la institución, como foro y taller de la comunidad universitaria que conforma, merece el mismo respeto y deferencia que le hemos reconocido a los profesores y estudiantes.(12) Partiendo de estos postulados debemos evaluar la controversia ante nos.

---

(12) *Cf. Cuesnongle v. Ramos,* supra, pág. 884. "These decisions establish *a zone of First Amendment protection* for the educational process itself, *which,* in proper circumstances, *must include not only students and teachers, but their host institutions as well.*" (Énfasis suplido.)

III

*Desarrollo del sistema obligatorio de licencia para institu-ciones privadas de educación postsecundaria*

■ El requisito de ley de que todas las instituciones pri-vadas de educación postsecundaria tengan licencias de auto-rización y las posteriores de renovación (acreditación) es un elemento nuevo introducido a nuestro ordenamiento jurídico por la Ley Núm. 31 de 1976. Anterior a esta ley, las institu-ciones educativas privadas podían ofrecer sus servicios de educación superior postsecundaria sin el requisito de licen-cia de autorización o de algún tipo de acreditación por parte del Estado. La Ley Núm. 88 de 25 de abril de 1949 le confirió al Consejo Superior de Enseñanza, organismo predecesor del C.E.S., la facultad de evaluar a los "colegio[s] o institu-ci[ones] . . . *que interesare[n] obtener reconocimiento acre-ditativo . . .".* (Énfasis suplido.) Sec. 3 de la Ley Núm. 88 (1949 Leyes de Puerto Rico 223, 225). Las instituciones pri-vadas de educación al nivel postsecundario por conveniencia o por el prestigio que esta acreditación conllevaba, seguían este procedimiento acreditativo. El sistema de entonces era, pues, de sometimiento y evaluación voluntaria.

■ A la Ley Núm. 88 de 1949 siguió la Ley Núm. 1 de 20 de enero de 1966 que introdujo el sistema de gobierno que rige actualmente para la Universidad de Puerto Rico, creó el C.E.S. y continuó el esquema de acreditación voluntaria. Art. 3, incisos (g)(1), (2) y (3).([13]) A base de la facultad confe-

---

([13]) 18 L.P.R.A. sec. 602(g)(1), (2) y (3):

"(g) *Acreditación de la educación superior privada.—*

"(1) El Consejo de Educación Superior adoptará y promulgará normas para la acreditación de la educación superior privada en Puerto Rico, previa au-diencia a las instituciones interesadas.

"(2) El Consejo acreditará las instituciones privadas de educación su-perior en Puerto Rico con el beneficio de la recomendación de una Junta Consul-

rida por esta ley, el 15 de septiembre de 1967, se aprobó el Reglamento sobre Acreditación de 1967.

■ Bajo ese esquema de acreditación voluntaria se desarrollaron un "gran número de instituciones [privadas de educación postsecundaria] . . . a l[a]s cuales no les [aplicaban las disposiciones de la Ley Núm. 1 de 1966] ya sea porque no solicita[ron] la acreditación de sus programas o porque habiéndola solicitado no cualifica[ban] para dicha acreditación por no cumplir con los requisitos establecidos. No obstante, [estas instituciones] contin[uaron] operando sin ninguna supervisión de parte del estado". Exposición de Motivos de la Ley Núm. 31 de 1976, 4ta Sesión Ordinaria, 7ma Asamblea Legislativa, 1976 Leyes de Puerto Rico 83. La Ley Núm. 31 de 1976 le confirió al C.E.S. la "facultad exclusiva para extender licencias de autorización para el establecimiento de instituciones educativas privadas al nivel . . . post secundario [o de educación superior,] . . . ya sean [éstas] de carácter académico, . . . [profesional o] técnico . . . dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico". 18 L.P.R.A. sec. 2101. Por primera vez en una ley sobre esta materia se dispuso que "[n]inguna persona natural o jurídica operar[ía] en Puerto Rico una institución educativa . . . de nivel post secundario o universitario . . . si no estuviera autorizada mediante licencias a tal efecto, expedidas por el . . . [C.E.S.]". Art. 1 de la Ley Núm. 31 de 1976 (18 L.P.R.A.

tiva de Acreditación de la Educación Superior Privada, según más adelante se provee, cuando se hayan cumplido las reglas para la acreditación promulgadas por el Consejo.

"(3) Para entender en cada solicitud de acreditación el Consejo designará especialmente una Junta Consultiva de Acreditación de la Educación Superior Privada, que estará compuesta por el Secretario de Instrucción Pública o su representante y educadores seleccionados de entre los miembros de instituciones privadas de educación universitaria existentes en Puerto Rico debidamente acreditadas y de la Universidad de Puerto Rico. Disponiéndose, que la composición de la Junta será determinada por el Consejo tomando en consideración la naturaleza y complejidad de la institución a ser acreditada."

sec. 2101). Dicha ley disminuyó el término por el cual se concedían licencias de acreditación, de diez (10) años a cuatro (4), al cabo de los cuales se renovarían por otro término igual, y dispuso que "[t]oda renovación de licencia otorgada ... por ... el [C.E.S.], se har[ía] de acuerdo a las normas de acreditación de instituciones y programas vigentes al momento en que se concede la licencia; de tal manera que la licencia de autorización equivaldrá a una licencia provisional y una licencia de renovación equivaldrá a una acreditación bajo las leyes vigentes y aplicables". 18 L.P.R.A. sec. 2101.

■ También estableció expresamente que no se estaban derogando "las disposiciones de la Ley núm. 2 del 22 de agosto de 1958, según enmendada, ni la Ley núm. 1 del 20 de enero de 1966, según enmendada" —(escolios omitidos) Art. 10 de la Ley Núm. 31 de 1976, *supra*, pág. 87— quedando así en vigor el Reglamento sobre Acreditación de 1967 aprobado al amparo de la Ley Núm. 1 de 1966 (18 L.P.R.A. sec. 601 *et seq.*).

■ Del historial legislativo de la Ley Núm. 31 de 1976, surge con evidente claridad que la preocupación primordial de los legisladores la constituía el efecto que estaba teniendo sobre los estudiantes, la ciudadanía y la educación del pueblo en general, la comercialización de la educación que se percibía con el desarrollo de un gran número de instituciones educativas privadas al nivel postsecundario no acreditadas. Algunas de estas instituciones estaban operando sin contar con los requisitos mínimos para llevar a cabo su cometido educativo. En relación con las instituciones privadas al nivel postsecundario que se habían acogido al sistema de licencia y acreditación voluntaria, la preocupación más bien giró en torno a que éstas no quedaran adversamente afectadas con la nueva legislación. No existía insatisfacción con la forma y

manera en que estaba operando el sistema de acreditación voluntaria.(14)

■ La Ley Núm. 31 de 1976, recogiendo todas estas inquietudes, estableció un sistema obligatorio de licencia para instituciones educativas privadas al nivel postsecundario, otorgándole al C.E.S. la autoridad para conceder, renovar, denegar, suspender o cancelar estas licencias. Para llevar a cabo esta encomienda lo dotó con facultad para adoptar las normas y los requisitos que estas instituciones deberían cumplir. Entre éstos se incluirían los "requisitos mínimos de planta física, de preparación académica del personal directivo y docente, de servicios bibliotecarios y de laboratorios relacionados, currículo y de capacidad de sostenimiento económico que garantice la continuidad de la enseñanza, la protección de la salud, seguridad de los estudiantes y el cumplimiento de los compromisos hechos por la institución". Art. 3 de la Ley Núm. 31 de 1976 (18 L.P.R.A. sec. 2103).

Para conjurar la preocupación de que la Ley Núm. 31 de 1976 fuese a afectar adversamente a las instituciones de educación privada al nivel postsecundario que estaban operando debidamente acreditadas bajo el sistema de acreditación voluntaria, el Art. 12(15) dispuso, como medida de transición, que a estas instituciones "se les otorgará la licencia automá-

---

(14) Informe Conjunto de las Comisiones de Instrucción y de Hacienda del Senado de 23 de mayo de 1975 relacionado con el P. de la C. 865, que luego se convirtió en la Ley Núm. 31 de 1976. Discusión en el Hemiciclo de la Cámara de Representantes sobre el Proyecto del Senado Sustitutivo al P. de la C. 865 obtenida del alegato del *amicus curiae* Asociación de Colegios y Universidades de Puerto Rico, Inc., págs. 12–16, ya que no se encuentra impresa en el Diario de Sesiones correspondiente. El *amicus curiae* obtuvo la información de la transcripción hecha hasta el presente. Véase escolio a la pág. 12 de su alegato.

Con respecto a estas preocupaciones, véase también la Exposición de Motivos de la Ley Núm. 31 de 1976, Leyes de Puerto Rico, pág. 83.

(15) Leyes de Puerto Rico, *supra*, pág. 88.

ticamente, quedando sujetas a las disposiciones de esta ley, en lo concerniente a renovación y cancelación de licencia".

IV

*Interrelación entre la Ley Núm. 31 de 1976, el reglamento sobre licencia y el reglamento sobre acreditación*

Con este trasfondo pasemos ahora a analizar la aplicación de estas leyes y reglamentos al caso de autos.

El C.E.S. arguye que, como la acreditación se da a una institución en función principalmente a los programas académicos y grados ofrecidos, el ofrecimiento de un nuevo programa da lugar a una nueva evaluación para acreditación, con la subsiguiente enmienda a la licencia, y que dentro del sistema de licencia obligatoria establecido por la Ley Núm. 31 de 1976 esta evaluación tiene que realizarse antes de comenzar el nuevo programa. Continúa arguyendo que, por lo tanto, el Art. 21, Cap. II del Reglamento sobre Acreditación de 1967, aprobado al amparo de la Ley Núm. 1 de 1966, *supra*, no puede subsistir por ser inconsistente con el sistema de licencia obligatoria creado por la Ley Núm. 31 de 1976, en tanto y en cuanto permite que se inicie un nuevo programa en una institución ya acreditada sin la previa evaluación y autorización del C.E.S. Aplicando entonces el Art. 5 del Reglamento sobre Licencias de 1977 concluye que cuando se van a iniciar programas nuevos en instituciones que ya poseen licencia de acreditación es requisito indispensable la evaluación y autorización previa por el C.E.S. y enmienda a la licencia correspondiente de acreditación. Para apuntalar su interpretación indica que la práctica administrativa ha sido ésta.

■ La Ley de la Universidad de Puerto Rico, Ley Núm. 1 de 1966, *supra*, y la Ley Núm. 31 de 1976,[16] aunque otorgan amplios poderes al C.E.S., no establecen específicamente el procedimiento a seguir cuando una institución educativa privada al nivel postsecundario que posee licencia de autorización y licencia de renovación (acreditación) desea comenzar nuevos cursos o programas académicos. La Asamblea Legislativa delegó en el C.E.S. para que éste estableciera mediante reglamento, de forma consistente con las leyes citadas, los requisitos que se deberían cumplir como condición para otorgar las antes mencionadas licencias. Por lo tanto, es a los reglamentos sobre licencias y acreditación donde debemos acudir en busca de una solución a la presente controversia.

Respecto a la práctica administrativa a que alude el C.E.S. en su alegato, basta con señalar que el tribunal de instancia determinó que tanto el C.E.S. como las instituciones educativas privadas al nivel postsecundario, incluso la recurrente U.I.A., habían sido inconsistentes en su forma de interpretar y aplicar estas disposiciones. Los documentos sometidos en este caso y en otros que han sido traídos a nuestra atención avalan esta determinación.[17]

El Reglamento sobre Licencias de 1977 regula dos tipos de licencias: la de autorización y la de renovación (acreditación).[18] La primera, es un requisito indispensable para co-

---

[16] El Art. 10 aclara que "[l]as disposiciones de esta ley no derogan las disposiciones de . . . la Ley núm. 1 del 20 de enero de 1966, según enmendada, [la cual continuará] en toda su vigencia". Leyes de Puerto Rico, *supra*, pág. 87.

Mediante el Art. 9 se instruye al C.E.S. a "promulgar reglas y reglamentos no incompatibles con esta ley". 18 L.P.R.A. sec. 2109.

[17] Véase esc. Núm. 9.

[18] En el Art. 1 del Cap. IV de este reglamento se describen las dos licencias de la forma siguiente:

"a. Licencia de Autorización — El Consejo concederá esta licencia por cuatro (4) años si la institución cumple con las normas y requisitos mínimos pres-

menzar a operar una institución educativa privada al nivel postsecundario. Antes de otorgar esta licencia, el C.E.S. evalúa la filosofía educativa y los propósitos de la institución. Además, pasa juicio sobre su administración y gobierno, finanzas, programas de estudio, personal docente, facilidades físicas y bibliotecas, sistema de admisiones, servicios a estudiantes y normas de responsabilidad pública adoptadas por la institución. La segunda de estas licencias, la de renovación (acreditación), se otorga cada cuatro (4) años para que pueda continuar operando la institución. En esta etapa la evaluación va dirigida a constatar "que las proyecciones hacia el logro de sus propósitos se han realizado o se están realizando de acuerdo a lo planificado". Art. 1(b), Cap. IV, Reglamento sobre Licencias de 1977.

El Reglamento sobre Licencias de 1977 requiere que se siga el procedimiento para enmendar la licencia de autorización o de renovación (acreditación) sólo bajo dos circunstancias: cuando se intenta operar una nueva unidad académica y cuando se quiera realizar un cambio de nombre a la institución. Art. 5(c) y (d), Cap. IV. La primera de estas dos situaciones requiere una evaluación previa del C.E.S.

Por otro lado, el mismo artículo, en sus Secs. 5(a) y 5(e), establece dos ocasiones en las que se requiere notificación al

---

critos en el Capítulo V de este Reglamento. En esta etapa la institución debe tener establecidos unos propósitos y un plan de acción hacia el logro de los mismos.

"b. Licencia de Renovación — El Consejo concederá esta licencia por cuatro (4) años luego que la institución haya sido acreditada, o su acreditación revalidada, con arreglo a las normas de acreditación que haya aprobado este organismo por disposición de la Ley Núm. 1 del 20 de enero de 1966, en su Artículo 3, Inciso G. En esta etapa la institución debe demostrar que las proyecciones hacia el logro de sus propósitos se han realizado o se están realizando de acuerdo a lo planificado."

Al otorgarse una licencia el C.E.S. debe especificar las unidades académicas que la institución evaluada puede operar, Art. 5(b) del Cap. IV, tales como: recintos, colegios regionales, escuelas profesionales y escuelas de estudios graduados. Art. 5(c) del Cap. IV del mismo reglamento.

C.E.S.: cuando se planee hacer cambios sustanciales que alteren significativamente los objetivos, campo de acción o control de la institución y cuando se realice un cambio en la composición o funciones asignadas a la junta de directores de la institución.[19] De otra parte, la Sec. 5(f) dispone, que la falta de notificación de cualesquiera de los cambios sustanciales previamente mencionados "será causa suficiente para cancelar la licencia de la institución". Como podrá observarse el reglamento establece específicamente la notificación previa al C.E.S. de cambios sustanciales, mas nada provee sobre la evaluación previa de los cambios así notificados.

Es claro que en el caso de autos la U.I.A. no pretende hacer un cambio de nombre a su institución, lo cual requeriría una enmienda a su licencia, ni realizar un cambio en la composición o funciones asignadas a la junta de directores de la institución. Lo que está planteado es si el nuevo programa de Maestría en Tecnología Médica es una nueva unidad académica para propósitos del Art. 5(c), Cap. IV del Reglamento sobre Licencias de 1977, para lo cual se requeriría evaluación previa del C.E.S., o si por el contrario, dicho programa constituye un cambio sustancial que altera significativamente los objetivos, el campo de acción o control de la institución, lo que sólo requeriría notificación al C.E.S., Art. 5(a), Cap. IV de dicho reglamento.

Ahora bien, tanto la Ley Núm. 31 de 1976 como el Reglamento sobre Licencias de 1977 se refieren[20] a las normas de acreditación, entiéndase el Reglamento sobre Acreditación de 1967, para el procedimiento de renovación de licencia. Por reglamentar asuntos germanos, estos reglamentos deben in-

---

[19] En relación con este asunto la propia Sec. 5(e) dispone que "[l]a información recibida será la base que usará el Consejo para ver que se cumpla con las disposiciones del Artículo 6 de la [Ley Núm. 31 de 1976]".

[20] Art. 10 de la Ley Núm. 31 de 1976, Leyes de Puerto Rico, *supra*, pág. 87, y Art. 1(b), Cap. IV del Reglamento sobre Licencias de 1977.

terpretarse de forma armoniosa siguiendo el principio de hermenéutica que dicta el Art. 18 del Código Civil, 31 L.P.R.A. sec. 18.([21]) Véanse: *Asoc. Médica de P.R.* v. *Cruz Azul*, 118 D.P.R. 669, 677 n. 10 (1987); *Álvarez* v. *Tribunal Superior*, 102 D.P.R. 236, 238 (1974); *United Hotels of P.R.* v. *Willig*, 89 D.P.R. 188, 195 (1963); R.E. Bernier, *Aprobación e interpretación de las leyes en Puerto Rico*, San Juan, Ed. Cultural, 1963, Cap. XII, pág. 147.

 Pasemos ahora a analizar las disposiciones reglamentarias pertinentes. El C.E.S. alega que el Art. 21, Cap. II del Reglamento sobre Acreditación de 1967 es incompatible con el sistema de licencia obligatoria. No le asiste la razón. La Ley Núm. 31 de 1976 fue aprobada con proyección hacia el futuro ante un mundo cambiante, dinámico, de continuos desarrollos técnicos y científicos, y de un constante crecimiento poblacional para regir en un área de sumo interés público. La intención legislativa no pudo ser otra que la de dotar al C.E.S. con el mayor grado de flexibilidad para que pudiese llevar a cabo la ingente y delicada función de acreditar instituciones educativas privadas al nivel postsecundario, al mismo tiempo que asegura que su intervención no socavará el fomento de nuevos e independientes foros para la libre discusión de ideas e implantación de conceptos innovadores.([22]) La ley autoriza al C.E.S. a establecer las normas y requisitos que deberán estas instituciones privadas cum-

---

([21]) El Art. 18 del Código Civil dispone:

"Las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro." 31 L.P.R.A. sec. 18.

([22]) Véase, también, XLIX Opiniones del Secretario de Justicia 25 (1978).

plir.(23) Este mandato es amplio, abarcador y flexible.(24) La ley no lo limita en cuanto al momento, forma y manera en que se debe ejercer la función evaluativa.(25) Consistente con este esquema, tampoco establece un listado exhaustivo de los requisitos que las instituciones deben cumplir para obtener y mantener la acreditación. El permitir que una institución educativa privada al nivel postsecundario que ha sido previamente acreditada, comience un nuevo programa sin la evaluación y autorización previa del C.E.S. no es incompatible con el sistema de licencia obligatoria establecido por la Ley Núm. 31 de 1976.

El Reglamento sobre Acreditación de 1967 expresa claramente que una institución previamente acreditada, como es el caso de la U.I.A., puede iniciar sin evaluación previa la revisión, modificación y ampliación normal de los programas previamente acreditados. Art. 5a(1) del Cap. II. El Art. 21 del mismo capítulo dispone el procedimiento a seguir en los casos de ampliaciones de programas subsiguientes a la acreditación:

> Cualquier ampliación subsiguiente a la acreditación que conlleve la creación de nuevos programas de estudios, o el otorgamiento de grados académicos o diplomas adicionales a los ya autorizados en colegios o instituciones acreditadas bajo este Reglamento, estará sujeto a una nueva evaluación respecto de los cursos o grados adicionales. En caso de evalua-

---

(23) Arts. 2 y 9 de la Ley Núm. 31 de 1976 (18 L.P.R.A. secs. 2102 y 2109).

(24) En relación con la delegación de poderes a agencias administrativas, recientemente en *M.&B.S., Inc.* v. *Depto. de Agricultura*, 118 D.P.R. 319 (1987), dijimos:

"Por la complejidad del mandato otorgado a estas agencias administrativas ha sido necesario que la Rama Legislativa les delegue poderes con normas amplias y generales permitiéndoles una gran discreción en el desarrollo y ejecución de la política pública."

(25) Como excepción a esto el Art. 1 de la Ley Núm. 31 de 1976 (18 L.P.R.A. sec. 2101) limita específicamente la duración de la licencia disponiendo que ésta será por cuatro (4) años.

ción favorable, se harán las enmiendas pertinentes al certificado de reconocimiento. Esta nueva evaluación deberá solicitarse, en lo posible, dentro de los dos (2) años subsiguientes a la creación del nuevo programa.[26]

De lo anterior se puede colegir que estos programas nuevos pueden ser evaluados luego de iniciados. Bajo estas circunstancias, la institución, como requisito previo a iniciar un nuevo programa, tiene el deber de notificar al C.E.S. su intención de comenzarlo. El C.E.S., a su vez, tiene facultad para evaluar el programa así iniciado cuando lo estime pertinente después de comenzado el mismo, o puede esperar y llevar a cabo la evaluación al momento en que esté realizando la evaluación general para la renovación de la licencia de acreditación.

El C.E.S. tiene suficientes mecanismos a su alcance para permitir la iniciación de nuevos programas o cursos sin evaluación previa, y aun poder realizar efectivamente la labor de supervisión que la Asamblea Legislativa le delegó cuando aprobó la Ley Núm. 31 de 1976. Sin pretender ser exhaustivos, veamos algunos de ellos. Utilizando el requisito de renovación de licencias que la ley acortó de diez (10) a cuatro (4) años, durante estas evaluaciones generales que se requieren para la reacreditación, el C.E.S. puede tomar en consideración la experiencia de la institución en relación con su ofrecimiento de nuevos programas y su patrón de conducta en esta área.[27] Véanse el Art. 22, Cap. II del Reglamento

---

[26] Estos nuevos programas, sin embargo, no pueden constituir una "nueva unidad académica" según se utiliza ese concepto en el Art. 5(c) del Cap. IV del Reglamento sobre Licencias de 1977; esto requeriría evaluación y autorización previa.

[27] El C.E.S. también tiene facultad para requerirle a las instituciones privadas acreditadas que planeen iniciar nuevos cursos que les informen a los estudiantes, e incluyan en los anuncios sobre los mismos, información relacionada con el hecho de que estos programas están sujetos a evaluación y que aún no han sido acreditados.

sobre Acreditación de 1967, y el Art. 1 del Cap. IV del Reglamento sobre Licencias de 1977. El C.E.S. también posee facultad para "disponer . . . para la revisión con mayor regularidad, así como *informes de progreso sobre nuevos programas u otros aspectos*". (Énfasis suplido.) Art. 22 del Cap. II del Reglamento sobre Acreditación de 1967.[28] De esta forma se garantiza la libertad de iniciativa de nuevos cursos y programas, sin que sufra menoscabo la función de supervisión del C.E.S. sobre las instituciones educativas privadas al nivel postsecundario, se salvaguarda el que estas instituciones tengan ciertas condiciones de calidad, estabilidad y seguridad mínimas en el ofrecimiento de nuevos programas, al mismo tiempo que se posibilita y fomenta la actividad innovadora y creadora tan necesaria para el examen de ideas dentro del ambiente académico.[29]

## V

*Procedimientos seguidos ante el C.E.S.*

En el caso de autos, y a tenor con el análisis que hemos hecho de las disposiciones de ley aplicables, sólo se requeri-

---

[28] De estimarlo pertinente, el C.E.S. tiene amplia facultad para actualizar sus reglamentos, definir sus contornos y revisar los procedimientos de licencia y acreditación.

[29] Según las Disposiciones Generales del Cap. III (Normas de Acreditación) del Reglamento sobre Acreditación de 1967, el "propósito básico" de la evaluación conducente a la acreditación "es el de apuntar hacia rasgos esenciales de responsabilidad y de solvencia orgánica y programática que deben caracterizar el funcionamiento de centros dedicados a la docencia superior. No se trata de elaborar fórmulas para alcanzar excelencia ni de exigir uniformidad estructural que excluya variantes y diversidades normales y deseables en un mundo educativo en proceso frecuente de readaptación y de cambio. Se trata más bien de señalar factores que tienden a constituir un denominador común en el esfuerzo por cumplir obligaciones adscritas a las tareas de la educación e investigación universitaria y colegial.

"Estas mismas normas generales complementadas por las normas correspondientes a programas específicos se aplicarán al evaluar los programas de estudios conducentes a determinados títulos, grados, diplomas y certificados cuando se trata de acreditar éstos."

ría una evaluación y autorización previa del C.E.S. si se determina que estamos ante la iniciación de una nueva unidad académica. Art. 5(c), Cap. IV del Reglamento sobre Licencias de 1977. Para el comienzo de un curso o programa bastaría la notificación de esta intención. No obstante, la U.I.A. optó por solicitar del C.E.S. la evaluación previa de su nuevo programa de Maestría en Tecnología Médica para el Recinto de Mayagüez y el C.E.S. acordó llevar a cabo dicha evaluación. Nada en la ley ni en los reglamentos prohíbe tal petición, y el C.E.S. posee amplia facultad y autoridad para acceder a la misma. Sometida a este proceso de evaluación, la U.I.A. presentó su moción de desestimación cuando ya se había completado el mismo y recaído decisión final contraria a sus intereses, incluso se había resuelto una moción de reconsideración en su contra. El proceso administrativo ante el C.E.S. había avanzado al "punto donde la equidad y la conciencia requieren que se considere que [la U.I.A.] ha hecho una elección final . . . [y que] ha renunciado su derecho al otro remedio". *Gandía* v. *Stubbe*, 34 D.P.R. 858, 867 (1926); *Pierson Muller I* v. *Feijoó*, 106 D.P.R. 838, 850 (1978).

No podemos permitir el que una parte que voluntariamente elige y se somete a un proceso administrativo, pueda hacer caso omiso a los resultados desfavorables de su gestión desistiendo de su solicitud una vez se le notifica una decisión adversa. Ante esta circunstancia el único remedio de revisión judicial disponible para que la U.I.A. revisara la decisión del C.E.S. sobre el nuevo programa de Maestría en Tecnología Médica era el establecido en el Art. 5 de la Ley Núm. 31 de 1976.([30]) La U.I.A. optó por no utilizarlo. La deci-

---

([30]) 18 L.P.R.A. sec. 2105. En relación con la revisión judicial de decisiones administrativas, véase B. Schwartz, *Administrative Law*, 2da ed., Boston, Little, Brown & Co., 1984, Cap. 8, Sec. 8.3.

sión del C.E.S. advino a ser final y firme.(31) La U.I.A. no podía continuar ofreciendo el programa que había sido evaluado negativamente por el C.E.S. Procedía el *injunction* solicitado al amparo del Art. 5 de la Ley Núm. 31 de 1976, *supra.*(32)

Por todo lo antes expresado, *se dictará sentencia confirmatoria de la dictada por el Tribunal Superior, Sala de San Juan.*

El Juez Asociado Señor Ortiz se inhibió. El Juez Asociado Señor Alonso Alonso no intervino.

---

(31) Por no estar ante nosotros la corrección de la evaluación hecha por el C.E.S. sobre el Programa de Maestría en Tecnología Médica de la U.I.A. no pasamos juicio sobre la misma.

(32) Nada de lo expresado en esta opinión impide que el C.E.S., dentro de las facultades que le han sido delegadas, utilizando su experiencia y conocimientos en materia de educación al nivel postsecundario, entienda nuevamente en este asunto y tome las providencias y medidas que estime necesarias y pertinentes, a la luz de los hechos que se le presenten, para llevar a cabo los objetivos de la Ley Núm. 31 de 1976.