EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Wilson López Leyro<br><br>    Recurrido<br><br>        vs.<br><br>Estado Libre Asociado de Puerto Rico; Secretario de Justicia, et al.<br><br>    Peticionarios | Certiorari<br><br>2008 TSPR 8<br><br>173 DPR ____ |

Número del Caso: CC-2006-1152


Fecha: 25 de enero de 2008


Tribunal de Apelaciones:

            Región Judicial de Ponce-Panel IX

Juez Ponente:

            Hon. German J. Brau Ramírez

Oficina del Procurador General:

            Lcda. Sylvia Roger Stefani
            Procuradora General Auxiliar

            Lcda. Mariana D. Negrón Vargas
            Subprocuradora General

Abogado de la Parte Recurrida:

            Lcdo. Roberto Rafols Dávila


Materia: Revisión de Decisión Administrativa


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wilson López Leyro

    Recurrido

        v.

Estado Libre Asociado de Puerto
Rico; Secretario de Justicia,       CC-2006-1152    Certiorari
Roberto J. Sánchez Ramos;
Lcdo. Miguel A. Pereira,
Director de la Administración
de Corrección; Sr. Carlos
González, Superintendente de la
Inst. de Adultos Ponce 1000

    Peticionarios

Opinión del Tribunal emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico, a 25 de enero de 2008.

Tenemos la oportunidad de determinar si el Comité de Clasificación y Tratamiento de una institución correccional tiene autoridad para atender el caso de un confinado, aunque semanas antes éste fuera sancionado por un Comité de Disciplina Institucional adscrito a la propia institución. Por entender que existe tal autoridad, revocamos el dictamen recurrido.

I.

El Sr. Wilson López Leyro fue condenado a cumplir una pena de 33 años de reclusión por asesinato en segundo grado, empleo de violencia contra la autoridad pública, posesión de drogas e

infracción de los Artículos 6 y 8 de la Ley de Armas. Actualmente extingue su sentencia en la cárcel de Ponce. López Leyro estaba clasificado como confinado de custodia mediana al momento de los hechos.

En dos ocasiones, la Administración de Corrección sancionó a López Leyro por desobedecer las normas disciplinarias de la institución. Ambos procedimientos fueron independientes: el primero respondió a la ausencia del confinado durante un recuento, al no encontrarse en su módulo de vivienda; el segundo, por ocupársele tres cigarrillos *Winston* que no podía tener. El confinado admitió los hechos en ambas instancias. Como resultado del segundo proceso, el Comité de Disciplina Institucional dispuso:

> El Honorable Comité Disciplinario Institucional le aplica 30 días de [s]egregación, 30 días sin visita, 30 días sin correspondencia, 30 días sin recreación, 30 días sin comisaría y **cambio de custodia**, basándonos en el Reglamento de Actos Prohibidos de Nivel II de Severidad. (Énfasis suplido).

El confinado solicitó oportunamente la revisión de esta determinación ante la Oficial de Reconsideración de la agencia. Dicha funcionaria **acogió la solicitud de reconsideración y dejó sin efecto todas las sanciones impuestas, excepto una**: redujo la suspensión del privilegio de compras en la comisaría a sólo diez días. Como fundamento, concluyó que dichas sanciones eran **muy excesivas**. Sin embargo, ésta no fue la última acción tomada por la agencia con respecto a López Leyro.

Dado que López Leyro incurrió en dos violaciones disciplinarias de Nivel II, el Comité de Clasificación y

Tratamiento —otro organismo de la institución correccional— decidió elevar su nivel de custodia a seguridad máxima. Dicho comité cumplimentó una planilla de evaluación en la que de forma numérica se determina el nivel de custodia adecuado para la situación particular de cada confinado. Por causa de las sanciones impuestas y de la severidad de los delitos por los que fue condenado, López Leyro satisfizo los factores que recomiendan una custodia máxima.

El confinado impugnó internamente esa decisión, mas la Oficina del Director de Clasificación denegó su apelación. López Leyro argumentó entonces que no podía reclasificársele en el nivel de custodia máxima, pues la propia agencia había dejado sin efecto el "cambio de custodia" que el Comité de Disciplina decretara antes.

Inconforme con el resultado del proceso apelativo interno, López Leyro recurrió en revisión administrativa ante el Tribunal de Apelaciones. Dicho Tribunal revocó por entender que "la decisión en reconsideración emitida por la agencia en los procedimientos disciplinarios seguidos contra el recurrente resultaba vinculante para el Comité de Clasificación y Tratamiento, quien venía obligado a seguir la determinación de que no se reclasificara al [confinado]".

El Procurador General comparece ante nos mediante petición de *certiorari*. En síntesis, plantea que el Comité de Disciplina es un ente distinto y con funciones separadas del Comité de Clasificación. Según el Procurador General, el Comité de Disciplina no tiene autoridad para ordenar cambios de custodia y sólo puede recomendarlos. En vista de ello, afirma que el Tribunal de Apelaciones erró al resolver que la

determinación de la Oficial de Reconsideración obligó al Comité de Clasificación, cuyo fin es supervisar el plan de rehabilitación institucional del confinado y no castigarlo. Argumenta que es a este comité al que le corresponde determinar el nivel de custodia de todo confinado. Por ende, sostiene que puede revisar tal nivel si, como en este caso, el confinado fue objeto de sanciones disciplinarias o llegó el momento de revisar su plan institucional.

Vista la petición, acordamos expedir.[1] Ambas partes presentaron sus alegatos. Con el beneficio de sus comparecencias, procedemos a resolver.

II.

Para examinar la extensión e interacción de las competencias de estos dos organismos de la Administración de Corrección, debemos interpretar las disposiciones de varios reglamentos de la agencia que aparentan estar en conflicto. Nuestra labor se limita, entonces, a la aplicación de las reglas de hermenéutica establecidas en nuestro ordenamiento — reglas que antes hemos extendido a la interpretación de diversos reglamentos.

_____

[1] López Leyro presentó una "Moción solicitando se dicte sentencia declarando académico el recurso apelado", pues ya fue reclasificado a custodia mediana. Le concedimos término al Procurador, quien se opuso a la desestimación. Alegó que la controversia aún es justiciable, porque puede recurrir y evadir la revisión judicial con respecto del propio confinado. Además, argumentó que existen consecuencias colaterales que pueden afectarse por un dictamen nuestro, ya que el propio confinado solicita que se considere el tiempo en que estuvo clasificado bajo custodia máxima como si hubiese estado en mediana. El 29 de junio de 2007 denegamos la desestimación solicitada. Están presentes circunstancias que nos permiten aplicar las excepciones a la doctrina de academicidad invocadas por el Procurador General. A similar conclusión llegamos en Cruz Negrón, *infra*, págs. 2-3.

Aclaramos que con esta Opinión no pretendemos adjudicar la validez de las sanciones impuestas al señor López Leyro, ni la corrección de la determinación tomada por el Comité de Clasificación. Lo primero, por no ser objeto de la sentencia recurrida; lo segundo, por no aplicar aquí alguna excepción a la particular deferencia que merecen las decisiones administrativas sobre clasificación de confinados. Cruz Negrón v. Administración de Corrección, res. el 28 de marzo de 2005, 2005 T.S.P.R. 34; véase además D. Fernández Quiñónez, Derecho Administrativo, *en Análisis del Término 2004-2005 del Tribunal Supremo de Puerto Rico*, 75 Rev. Jur. U.P.R. 67, 81-88 (2006).

A.

Sabido es que la función final de los reglamentos es atender una gran variedad de casos mediante normas de aplicación general que puedan ser empleadas e interpretadas por funcionarios de la propia agencia. Véanse M. & B. S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319, 325 (1987); D. Fernández Quiñónez, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Bogotá, Ed. Forum, 2001, pág. 105. Cuando la delegación sancionada por el Poder Legislativo es amplia y está matizada por criterios generales, la aprobación de reglamentos sirve para definir los límites y contornos de la autoridad delegada. Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105 (2002); Torres Arzola v. Policía de P.R., 117 D.P.R. 204, 211 (1986); López v. Junta de Planificación, 80 D.P.R. 646, 661 (1958).

"Una vez el organismo administrativo ha definido los contornos de su acción a través de reglamentos debidamente promulgados, le corresponde aplicarlos celosamente". Torres

Arzola, *supra*. Compete a los tribunales, y particularmente a esta Curia, analizar detenidamente las acciones administrativas para así determinar si se ajustan al ámbito prescrito por la ley habilitadora de la agencia o por nuestra Constitución. Véase, e.g., Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218 (1974).

La sección 1.3(*l*) de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 del 12 de agosto de 1988, según enmendada, dispone que una regla o reglamento será "cualquier norma o conjunto de normas de una agencia que sea de aplicación general[,] que ejecute o interprete la política pública o ley, o que regule los requisitos de los procedimientos y prácticas de una agencia". 3 L.P.R.A. sec. 3102(*l*). Señala, además, que el término también comprenderá la enmienda, revocación o suspensión de una regla existente. Las reglas, entonces, pueden ser de tres tipos: las que formulan política pública, las que ejecutan o interpretan la ley, o las que establecen procedimientos. D. Fernández, *supra*, pág. 109. Puesto de otra manera, pueden ser reglas procesales, reglas sustantivas o legislativas, o reglas interpretativas. D. Fernández, *supra*, pág. 122.

Aun cuando el reglamento esté dentro del ámbito del estatuto orgánico de la agencia, ello no significa que sea automáticamente válido. Reiteradamente hemos resuelto que las reglas promulgadas por una agencia no pueden ser caprichosas ni arbitrarias. Aulet Lebrón v. Depto. de Servicios Sociales, 129 D.P.R. 1, 26 (1991); Luán Investment Corp. v. Román, 125 D.P.R. 533, 550 (1990); M & B. S., *supra*. Cuando se impugna la intervención de un organismo administrativo por alegadamente

carecer de autoridad en determinado caso, sin duda se plantea una cuestión de Derecho. Una alegación en tal dirección reta las bases jurisdiccionales del organismo: bien por exceder límites estatutarios, bien por ignorar excepciones a la intervención establecidas por el propio reglamento. En tales casos, los tribunales pueden revisar en todos sus extremos las conclusiones legales que justifican tal actuación. Cf. 3 L.P.R.A. sec. 2175; Ramírez Rivera v. Depto. de Salud, 147 D.P.R. 901 (1999).

Ahora bien, las agencias cuentan con un peritaje vasto en relación con la materia objeto de su gestión rutinaria. "La interpretación que del estatuto [éstas] hagan y los fundamentos que aducen en apoyo de la misma, resultan de gran ayuda para los tribunales de justicia" al pasar juicio sobre la corrección de las decisiones administrativas. M & V Orthodontics v. Negdo. Seg. Empleo, 115 D.P.R. 183, 189 (1984); véase además Quevedo Segarra v. J.A.C.L., 102 D.P.R. 87, 96 (1974). Considerado esto, también hemos resuelto que los tribunales han de darle gran deferencia a las aplicaciones e interpretaciones que las agencias hagan de sus propios reglamentos y de las leyes que administran. Cruz Negrón, supra, pág. 7; Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70 (2000); Román v. Superintendente, 93 D.P.R. 685 (1966).

Aun así, de ordinario los reglamentos crean un estado de Derecho que protege a quienes actúan bajo sus disposiciones, PSP v. CEE, 110 D.P.R. 400, 409 (1980). Las agencias administrativas, por tanto, no pueden ignorar sus propias reglas y fundamentar sus actos en una autoridad interpretativa

superior debido a su particular experiencia. Por esto, las interpretaciones que las agencias realicen de sus propios reglamentos deben ampararse en la razón y en la afinidad con sus leyes habilitadoras. Véase D. Fernández, *supra*, pág. 566.

B.

Los Artículos 12-23 del Código Civil de Puerto Rico establecen normas básicas para la interpretación y aplicación de las leyes aprobadas por el Poder Legislativo. 31 L.P.R.A. seccs. 12-23. Estas normas disponen, entre otras cosas, la forma de suplir deficiencias en las leyes especiales; la sujeción a la letra clara de las leyes y su interpretación integral; y, ante estatutos poco claros, la consideración de su razón y espíritu para así hallar la causa o los motivos que indujeron al Poder Legislativo a actuar. Nuestras decisiones han incorporado o desarrollado otras reglas de hermenéutica como, por ejemplo, la relativa a la deferencia que merecen las interpretaciones jurídicas de las agencias. Véase *supra*, pág. 8.

Cabe tener presente que no se trata de aplicar con lógica mecánica determinada interpretación, sino de formular aquella que sea cónsona con las necesidades contemporáneas de nuestra sociedad y con la intención original de la ley según fue aprobada. Véase, e.g, <u>Febo Ortega v. Tribunal Superior</u>, 102 D.P.R. 405, 409 (1974); véase además <u>Romero Barceló v. ELA</u>, res. el 10 de noviembre de 2006, 2006 T.S.P.R. 163. La tarea de este Tribunal no se limita a la simple aplicación de la ley, pues nos compete dilucidar controversias que tocan de cerca el orden social del país, los derechos y libertades de sus ciudadanos, y la propia estabilidad de nuestro gobierno

constitucional. De ahí que no podamos ignorar que las leyes se aprueban con un fin. No debemos reducirlas a la futilidad mediante interpretaciones textuales que trunquen su fuerza y propósito.

Desde hace ya algún tiempo extendimos estas normas a la interpretación de reglamentos promulgados por las agencias administrativas del país. Véase, e.g., Monllor v. Soc. de Gananciales, 138 D.P.R. 600, 607 (1995); CES v. UIA, 120 D.P.R. 224, 243-44 (1987); cf. Ready Mix Concrete v. Comisión Industrial, 92 D.P.R. 37 (1965). Hoy reafirmamos y continuamos esa tradición.

III.

A.

La Sección 19 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico dispone que "será política pública del Estado […] reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social". Con esto en mente, la Ley Orgánica de la Administración de Corrección, Ley Núm. 116 del 22 de julio de 1974, según enmendada, autoriza a la agencia a "[e]structurar la política pública en el área de corrección" y a "formular […] la reglamentación interna necesaria para los programas de diagnóstico, clasificación, tratamiento y rehabilitación de la clientela del sistema correccional". 4 L.P.R.A. sec. 1112(a) y (c). Véase Cruz Negrón, supra, pág. 4. La Administración de Corrección tiene, sin duda, el deber de administrar un sistema integrado que implante enfoques

diversos para ofrecerle un tratamiento individualizado y eficaz a los confinados. 4 L.P.R.A. sec. 1111.

En atención a estos propósitos y a la política pública, tanto constitucional como estatutaria, que inspira el manejo y el tratamiento de los confinados de nuestro país, Corrección ha aprobado tres de los reglamentos que aquí consideramos. En la interpretación integrada de sus disposiciones, hallaremos la solución a la controversia ante nuestra consideración.

B.

El Reglamento de Procedimientos Disciplinarios para Confinados y Participantes de Programas de Desvío y Comunitarios, Reglamento Núm. 6994 del 29 de junio de 2005 ("Reglamento Disciplinario") se promulgó con el fin de propiciar un ambiente de seguridad y orden en las instituciones correccionales del país. Para lograrlo, provee un mecanismo que permite imponerle sanciones disciplinarias a aquellos confinados que infrinjan las normas y procedimientos de la institución. El Reglamento Disciplinario establece tanto la estructura del aparato sancionador, como las normas sustantivas y los procedimientos que éste habrá de seguir.

Para administrar sus normas, el mencionado reglamento estableció un comité compuesto por tres miembros seleccionados por el Superintendente de cada institución. El Comité celebra vistas cuando se le imputa a un confinado la comisión de actos prohibidos de Nivel II ó III. Regla 4(c), Reglamento Disciplinario, *supra*. De tratarse de un acto de Nivel I (severidad extrema), el Comité no puede ver la querella y debe referirla a un Oficial Examinador de Vistas Disciplinarias. Regla 11(c), Reglamento Disciplinario, *supra*. Todo confinado

debe ser orientado sobre las normas institucionales al momento de su ingreso. Regla 5, Reglamento Disciplinario, *supra*.

Entre las acciones que pueden tomar tanto el Comité como el Oficial Examinador, se encuentra el **recomendar** cambios de custodia al Comité de Clasificación a manera de sanción. Tabla IV, Reglamento Disciplinario, *supra*, pág. 30. Más allá de permitir tal recomendación como medida disciplinaria, **en todos los casos de actos prohibidos de Nivel II, el Comité tiene la obligación de referir su determinación al Comité de Clasificación para que este último evalúe si la situación del confinado sancionado amerita cambios en su nivel de custodia.** Regla 12(b), Reglamento Disciplinario, *supra*. Igual normativa aplica cuando un Oficial Examinador de Vistas Disciplinarias interviene. Ahora bien, **de desestimarse la querella disciplinaria, se retira del expediente del confinado y no puede utilizarse la información de ésta en la evaluación del caso por el Comité de Clasificación.** Regla 12(g), Reglamento Disciplinario, *supra*.

C.

Por otro lado, para lograr la rehabilitación de los confinados y ofrecerles un tratamiento individualizado, la Administración de Corrección creó un Comité de Clasificación y Tratamiento que toma todas las decisiones fundamentales respecto del confinado. Manual de Reglas para Crear y Definir Funciones del Comité de Clasificación y Tratamiento en las Instituciones Penales, Reglamento Núm. 2485 del 2 de marzo de 1979, pág. 1 ("Manual de Reglas"). Su responsabilidad es muy clara: evaluar la situación del confinado para determinar el plan de acción a seguir en cada caso y medir el progreso

alcanzado por éste, con el fin de garantizar su rehabilitación y la seguridad de la sociedad. Para ello, el Comité de Clasificación evalúa las necesidades, las capacidades, los intereses, las limitaciones y el funcionamiento social del confinado, en pos de estructurarle un plan institucional de tratamiento sujeto a evaluaciones periódicas. Regla 2, Manual de Reglas, *supra*.

Corrección aprobó, además, el Manual de Clasificación de Confinados, Reglamento Núm. 6067 del 23 de diciembre de 1999 ("Manual de Clasificación"). Éste proclama que el método de clasificación de confinados es esencial para la eficacia de todo sistema correccional. La clasificación de confinados busca separar de manera sistemática y evolutiva a los confinados en subgrupos, luego de considerar las necesidades de cada individuo, y las exigencias y preocupaciones de la sociedad. Este proceso comienza con el ingreso del confinado y termina el día de su excarcelación. Así, el mecanismo sirve para coordinar la custodia física de los confinados con los programas y recursos disponibles dentro del sistema correccional. Se atiende, además, el interés en la protección social, dado que los sujetos más peligrosos son mantenidos bajo controles mayores.

La jurisdicción del Comité de Clasificación incluye, entre otras cosas: el tipo de custodia; el alojamiento; las oportunidades de trabajo, estudio o adiestramiento vocacional; y el tratamiento de condiciones especializadas. Sec. 2.IV.C, Manual de Clasificación, *supra*. Por otra parte, las revisiones periódicas tienen el fin de determinar si el plan responde a las necesidades del confinado y si deben hacérsele ajustes.

Regla 2, Manual de Reglas, *supra*. Se revisa anualmente el nivel de custodia de todo confinado en seguridad mínima y mediana; mientras que los clasificados en máxima son atendidos cada seis meses, tras cumplir un año de su sentencia. Sec. 2.V.D, Manual de Clasificación, *supra*.

La reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación o en la vivienda asignada. Su función principal es supervisar la adaptación del confinado y prestarle atención a cualquier situación que pueda presentarse. Sec. 7.II, Manual de Clasificación, *supra*. En ésta se recalca aún más la conducta institucional como reflejo del comportamiento real del confinado durante su reclusión. Aparte de las revisiones rutinarias, se hacen revisiones automáticas no rutinarias cuando, entre otras cosas, el confinado es "convicto" por una violación disciplinaria de Nivel I ó II, según definidas por la Administración de Corrección. Sec. 7.III.B, Manual de Clasificación, *supra*.

No obstante, el Comité de Clasificación no puede intervenir cuando se emiten órdenes por el Tribunal como resultado de recursos legales que el confinado ha llevado o **cuando se toma cualquier acción inmediata con un confinado al amparo de disposiciones del Reglamento Disciplinario**. Además, se proscribe la intervención del Comité cuando el confinado solicita ser aislado por razones de seguridad o en aquellas situaciones en que por reglamento se dispone la abstención. Regla 7, Manual de Reglas, *supra*. Finalmente, las normas contenidas en el Manual de Reglas se aplican con fines terapéuticos y están matizadas por el propósito estatal de

promover la rehabilitación del confinado. Regla 11, Manual de Reglas, *supra*.

IV.

En su alegato, López Leyro nos presenta una variedad de planteamientos por los cuales solicita que sostengamos el dictamen recurrido.[2] No obstante, su argumento fundamental se relaciona con una cuestión jurisdiccional, por lo que habremos de centrarnos en él. En síntesis, López Leyro plantea que la Regla 7 del Manual de Reglas, *supra*, dispone que el Comité de Clasificación no debe intervenir con la evaluación de una situación relacionada con el confinado cuando éste ya ha sido sancionado según el procedimiento disciplinario de la agencia. Aduce, por tanto, que su reclasificación fue ordenada por un organismo sin autoridad para ello. Discrepamos de esa interpretación.

Es cierto que la citada Regla 7 establece que el Comité de Clasificación no intervendrá en las circunstancias descritas por el confinado. No obstante, un análisis de los reglamentos de la Administración de Corrección aplicables a este caso nos convence de que a dicha disposición no se le puede conferir el alcance que propone el recurrido. Veamos.

En 1975, la Administración de Corrección aprobó un Reglamento para los Procedimientos Disciplinarios, Reglamento

---

[2]El recurrido parece invocar la protección constitucional contra castigos crueles e inusitados, pero no nos explica de qué manera el proceso de clasificación puede constituir tal cosa. Además, nos solicita que interpretemos la acción de la Oficial de Reconsideración como determinación institucional de la agencia, cuyo efecto sería privar a otros componentes administrativos de disponer sobre asuntos relacionados con el confinado. También nos plantea que el Comité de Clasificación no tenía autoridad para intervenir.

Núm. 1986 del 18 de septiembre de 1975 ("Reglamento para los Procedimientos"), que fue derogado por el actual Reglamento Disciplinario, *supra*, promulgado en el año 2005. Del reglamento derogado se puede colegir que quien entonces imponía sanciones disciplinarias no era un comité de funcionarios correccionales, sino un Oficial Examinador nombrado por el Administrador de Corrección. Éste tenía la potestad para ordenar cambios de custodia por períodos no mayores de tres meses, en casos de ofensas menores, o no más de seis meses, en casos graves. La Regla 10 del reglamento derogado disponía, además: "Nada de lo señalado en esta sección sobre sanciones, limitará la facultad del Comité de Tratamiento […] para tomar la acción que corresponda, **una vez cumplida la sanción impuesta**, en lo que se refiere al tratamiento a adoptarse de ahí en adelante para rehabilitar al cliente" (énfasis suplido).

A su vez, el Manual de Reglas, *supra* –vigente al momento de los hechos y contemporáneo al reglamento derogado que citamos arriba— establece también que el Comité de Clasificación puede considerar situaciones relacionadas con el confinado (e.g. cambios de custodia) **"al cese de las sanciones disciplinarias"** o para "[e]valuación por referi[do] del Oficial Examinador **luego de haber sido intervenido por una querella en Vista Administrativa"** (énfasis suplido). Al interpretar las disposiciones vigentes de forma integral, según el mandato del Art. 18 del Código Civil, 31 L.P.R.A. sec. 18, no hay duda que el Manual de Reglas faculta al Comité de Clasificación a realizar una evaluación no rutinaria del confinado tras cumplirse la sanción disciplinaria impuesta a

éste. Véase además Sec. 7.III.B, Manual de Clasificación, *supra*. La Regla 7 se convirtió en norma ambigua y poco lógica al derogarse el reglamento sobre asuntos disciplinarios que le era contemporáneo. A pesar de ello, no podemos ignorarla.

No se trata de que un Comité obligue a otro o no. La intención de estas disposiciones es mantener separadas las funciones de ambos comités, al evitar que uno intervenga con las determinaciones del otro. Lo que surge de los reglamentos reseñados es un orden de acción. Si bien el Comité de Disciplina sólo podía **recomendar** un cambio de custodia como sanción, ello no significa que al exceder su autoridad y ordenar ese cambio, el Comité de Clasificación pueda intervenir sin haber llegado el momento para hacerlo.

Concluimos, por tanto, que el Comité de Clasificación y Tratamiento de una institución penal puede intervenir con el caso de un confinado, de forma no rutinaria, **tras cesar las sanciones impuestas por violación de las normas disciplinarias institucionales**. La excepción a la intervención del Comité contenida en el Manual de Reglas, *supra*, tiene un propósito. Su razón de ser original, como hemos confirmado, era proveerles un espacio a las autoridades disciplinarias de la institución para así evitar que otros componentes –fuera del curso apelativo interno— interviniesen con las sanciones impuestas.

Así, cuando el aparato disciplinario disponga sancionar a un confinado con 30 días de segregación, por ejemplo, no podrá el Comité de Clasificación intervenir y desautorizar tal acción. De igual forma, cuando se aísle a un confinado en determinada institución por razones de seguridad, no podrá

intervenir el Comité de Clasificación, pues un cambio del nivel de custodia podría ponerlo en peligro. En estos casos, el único curso a seguir es el dispuesto para revisar la determinación sobre disciplina: curso disponible tanto para el confinado, como para las autoridades carcelarias. Con esta interpretación damos efecto a todos los reglamentos aplicables, pues no encontramos circunstancias claras que nos permitan inferir una derogación tácita de alguna de las disposiciones aquí pertinentes. Otra cosa sería pretender enmendar reglamentos debidamente promulgados; cosa que no nos compete hacer.

En el caso de López Leyro, éste fue sancionado el 29 de marzo de 2006. Las sanciones impuestas tenían una duración de 30 días, por lo que vencían el 28 de abril de 2006. Por ende, tras cumplirse ese término, el Comité de Clasificación tenía autoridad para revisar el plan institucional del confinado. Aunque el 17 de mayo la Oficial de Reconsideración dejó sin efecto casi todas las sanciones contra López Leyro, no desestimó la querella. Es decir, se sostuvo la "convicción" de López por violar la prohibición de contrabando. No podemos concluir que al atenuar las sanciones impuestas, la Oficial de Reconsideración tuvo la intención de eximir de responsabilidad al confinado. Como la determinación del Comité de Clasificación fue tomada el 9 de mayo de 2006 —mucho después de haber expirado el término de las sanciones contra López—, no cabe duda que éste podía evaluar el caso y variar la clasificación de la custodia.

V.

Por los fundamentos que anteceden, revocamos la Sentencia emitida por el Tribunal de Apelaciones y, en consecuencia, sostenemos la determinación de la Administración de Corrección.

Se dictará Sentencia de conformidad.


Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wilson López Leyro

    Recurrido

        v.

Estado Libre Asociado de Puerto Rico; Secretario de Justicia, Roberto J. Sánchez Ramos; Lcdo. Miguel A. Pereira, Director de la Administración de Corrección; Sr. Carlos González, Superintendente de la Inst. de Adultos Ponce 1000

    Peticionarios

CC-2006-1152     Certiorari

SENTENCIA

San Juan, Puerto Rico, a 25 de enero de 2008.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la Sentencia emitida por el Tribunal de Apelaciones y, en consecuencia, se sostiene la determinación de la Administración de Corrección.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre con el resultado sin opinión escrita. El Juez Asociado señor Rebollo López disiente sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo