El Juez Presidente Señor Hernández Denton
emitió la opinión del Tribunal.
Tenemos la oportunidad de determinar si el Comité de Clasificación y Tratamiento de una institución correccional tiene autoridad para atender el caso de un confinado, aun-que semanas antes éste fuera sancionado por un Comité de Disciplina Institucional adscrito a la propia institución. Por entender que existe tal autoridad, revocamos el dicta-men recurrido.
I
El Sr. Wilson López Leyro fue condenado a cumplir una pena de 33 años de reclusión por asesinato en segundo grado, empleo de violencia contra ía autoridad pública, po-sesión de drogas e infracción de los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sees. 416 y 418. Actualmente extingue su sentencia en la cárcel de Ponce. López Leyro estaba clasificado como confinado de custodia mediana al momento de los hechos.
En dos ocasiones, la Administración de Corrección san-cionó a López Leyro por desobedecer las normas disciplina-rias de la institución. Ambos procedimientos fueron inde-pendientes: el primero respondió a la ausencia del confinado durante un recuento, al no encontrarse en su módulo de vivienda; el segundo, por ocupársele tres ciga-rrillos Winston que no podía tener. El confinado admitió los hechos en ambas instancias. Como resultado del segundo proceso, el Comité de Disciplina institucional dispuso:
El Honorable Comité Disciplinario Institucional le aplica 30 *22 días de [segregación, 30 días sin visita, 30 días sin correspon-dencia, 30 días sin recreación, 30 días sin comisaría y cambio de custodia, basándonos en el Reglamento de Actos Prohibidos de Nivel II de Severidad. (Énfasis suplido.)
El confinado solicitó oportunamente la revisión de esta determinación ante la Oficial de Reconsideración de la agencia. Dicha funcionaría acogió la solicitud de reconside-ración y dejó sin efecto todas las sanciones impuestas, ex-cepto una: redujo la suspensión del privilegio de compras en la comisaría a sólo diez días. Como fundamento, con-cluyó que dichas sanciones eran muy excesivas. Sin embargo, ésta no fue la última acción que tomó la agencia con respecto a López Leyro.
Dado que López Leyro incurrió en dos violaciones disci-plinarias de Nivel II, el Comité de Clasificación y Trata-miento —otro organismo de la institución correccional— decidió elevar su nivel de custodia a seguridad máxima. Dicho comité cumplimentó una planilla de evaluación en la que se determina de forma numérica el nivel de custodia adecuado para la situación particular de cada confinado. Como consecuencia de las sanciones impuestas y de la se-veridad de los delitos por los que fue condenado, López Leyro satisfizo los factores que recomiendan una custodia máxima.
El confinado impugnó internamente esa decisión, mas la Oficina del Director de Clasificación denegó su apelación. López Leyro argumentó, entonces, que no podía reclasificársele en el nivel de custodia máxima, pues la propia agencia había dejado sin efecto el “cambio de custo-dia” que el Comité de Disciplina Institucional decretara antes.
Inconforme con el resultado del proceso apelativo in-terno, López Leyro recurrió en revisión administrativa ante el Tribunal de Apelaciones. Dicho tribunal revocó por entender que “la decisión en reconsideración emitida por la agencia en los procedimientos disciplinarios seguidos contra el recurrente resultaba vinculante para el Comité de *23 Clasificación y Tratamiento, quien venía obligado a seguir la determinación de que no se reclasificara al [confinado]”.
El Procurador General comparece ante nos mediante una petición de certiorari. En síntesis, plantea que el Co-mité de Disciplina Institucional es un ente distinto y con funciones separadas del Comité de Clasificación y Tratamiento. Según el Procurador General, el Comité de Disciplina Institucional no tiene autoridad para ordenar cambios de custodia y sólo puede recomendarlos. Afirma que el Tribunal de Apelaciones erró al resolver que la de-terminación de la Oficial de Reconsideración obligó al Co-mité de Clasificación, cuyo fin es supervisar el plan de re-habilitación institucional del confinado y no castigarlo. Argumenta que es a este comité al que le corresponde de-terminar el nivel de custodia de todo confinado. Por ende, sostiene que puede revisar tal nivel si, como en este caso, el confinado fue objeto de sanciones disciplinarias o llegó el momento de revisar su plan institucional.
Vista la petición, acordamos expedir. (1) Ambas partes presentaron sus alegatos. Con el beneficio de sus compare-cencias, procedemos a resolver.
II
Para examinar la extensión e interacción de las compe-tencias de estos dos organismos de la Administración de Corrección, debemos interpretar las disposiciones de varios *24 reglamentos de la agencia que aparentan estar en conflicto. Nuestra labor se limita, entonces, a aplicar las reglas de hermenéutica establecidas en nuestro ordena-miento, reglas que antes hemos extendido a la interpreta-ción de diversos reglamentos.
Aclaramos que con esta opinión no pretendemos adjudi-car la validez de las sanciones impuestas al señor López Leyro ni la corrección de la determinación tomada por el Comité de Clasificación y Tratamiento. Lo primero, por no ser objeto de la sentencia recurrida; lo segundo, por no aplicar aquí alguna excepción a la particular deferencia que merecen las decisiones administrativas sobre clasificación de confinados. Cruz v. Administración, 164 D.P.R. 341 (2005). Véase, además, D. Fernández Quiñones, Derecho Administrativo, en Análisis del Término 2004-2005 del Tribunal Supremo de Puerto Rico, 75 (Núm. 1) Rev. Jur. U.P.R. 67, 81-88 (2006).
A. La función final de los reglamentos es atender una gran variedad de casos mediante normas de aplicación general que puedan emplearlas e interpretarlas los funcionarios de la propia agencia. Véanse: M. & B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319, 325 (1987); D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed. rev., Bogotá, Ed. Forum, 2001, pág. 105. Cuando la delegación sancionada por el Poder Legislativo es amplia y está matizada por criterios generales, la aprobación de reglamentos sirve para definir los límites y contornos de la autoridad delegada. Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105 (2002); Torres Arzola v. Policía de P.R., 117 D.P.R. 204, 211 (1986); López v. Junta Planificación, 80 D.P.R. 646, 661 (1958).
“Una vez el organismo administrativo ha definido los contornos de su acción a través de reglamentos debidamente promulgados, le corresponde aplicarlos celosa- *25 mente.” Torres Arzola v. Policía de P.R., supra, pág. 211. Compete a los tribunales, y particularmente a esta Curia, analizar detenidamente las acciones administrativas para determinar si se ajustan al ámbito prescrito por la ley habilitadora de la agencia o por nuestra Constitución. Véase, e.g., Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218 (1974).
La Sec. 1.3(l) de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, dispone que una regla o reglamento será “cualquier norma o conjunto de normas de una agencia que sea de aplicación generál[,] que ejecute o interprete la política pública o ley, o que regule los requisitos de los procedimientos y prácticas de una agencia”. 3 L.P.R.A. sec. 2102(l). Señala, además, que el término también comprenderá la enmienda, revocación o suspensión de una regla existente. Las reglas, entonces, pueden ser de tres tipos: las que formulan política pública, las que ejecutan o interpretan la ley, o las que establecen procedimientos. Fernández Quiñones, op. cit., pág. 109. Puesto de otra manera, pueden ser reglas procesales, reglas sustantivas o legislativas, o reglas interpretativas. Fernández Quiñones, op. cit., pág. 122.
Aun cuando el reglamento esté dentro del ámbito del estatuto orgánico de la agencia, ello no significa que sea válido automáticamente. Reiteradamente hemos resuelto que las reglas promulgadas por una agencia no pueden ser caprichosas ni arbitrarias. Aulet v. Depto. Servicios Sociales, 129 D.P.R. 1, 26 (1991); Luan Investment Corp. v. Román, 125 D.P.R. 533, 550 (1990); M & B.S. Inc. v. Depto. de Agricultura, supra. Cuando se impugna la intervención de un organismo administrativo por supuestamente carecer de autoridad en determinado caso, sin duda se plantea una cuestión de derecho. Una alegación en tal dirección reta las bases jurisdiccionales del organismo: bien por ex- *26 ceder límites estatutarios, bien por ignorar excepciones a la intervención establecidas por el propio reglamento. En tales casos, los tribunales pueden revisar en todos sus extremos las conclusiones legales que justifican tal actuación. Cf. 3 L.P.R.A. sec. 2175; Ramírez v. Depto. de Salud, 147 D.P.R. 901 (1999).
Ahora bien, las agencias cuentan con un peritaje vasto en relación con la materia objeto de su gestión rutinaria. “La interpretación que del estatuto ést[a]s hagan y los fundamentos que aducen en apoyo de la misma, resultan de gran ayuda para los tribunales de justicia” al pasar juicio sobre la corrección de las decisiones administrativas. M & V Orthodontics v. Negdo. Seg. Empleo, 115 D.P.R. 183, 189 (1984). Véase, además, Quevedo Segarra v. J.A.C.L., 102 D.P.R. 87, 96 (1974). Considerado esto, también hemos resuelto que los tribunales deben darle gran deferencia a las aplicaciones e interpretaciones que las agencias hacen de sus propios reglamentos y de las leyes que administran. Cruz v. Administración, supra, pág. 355; Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70 (2000); Román v. Superintendente de la Policía, 93 D.P.R. 685 (1966).
Aun así, de ordinario los reglamentos crean un estado de derecho que protege a quienes actúan bajo sus disposiciones, P.S.P. v. Comisión Estatal de Elecciones, 110 D.P.R. 400, 409 (1980). Las agencias administrativas, por lo tanto, no pueden ignorar sus propias reglas y fundamentar sus actos en una autoridad interpretativa superior debido a su particular experiencia. Por esto, las interpretaciones que las agencias realicen de sus propios reglamentos se deben amparar en la razón y en la afinidad con sus leyes habilitadoras. Véase Fernández Quiñones, op. cit., pág. 566.
B. Los Arts. 12 al 23 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 12-23, establecen normas básicas *27 para la interpretación y aplicación de las leyes aprobadas por el Poder Legislativo. Estas normas disponen, entre otras cosas, la forma de suplir deficiencias en las leyes es-peciales; la sujeción a la letra clara de las leyes y su inter-pretación integral, y, ante estatutos poco claros, la conside-ración de su razón y espíritu para así hallar la causa o los motivos que indujeron al Poder Legislativo a actuar. Nues-tras decisiones han incorporado o desarrollado otras reglas de hermenéutica como, por ejemplo, la relativa a la defe-rencia que merecen las interpretaciones jurídicas de las agencias. Véase Cruz v. Administración, supra, págs. 357-358.
Es necesario tener presente que no se trata de aplicar con lógica mecánica determinada interpretación, sino de formular aquella que sea cónsona con las necesidades contemporáneas de nuestra sociedad y con la intención original de la ley según fue aprobada. Véase, e.g., Febo Ortega v. Tribunal Superior, 102 D.P.R. 405, 409 (1974). Véase, además, Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006). La tarea de este Tribunal no se limita a la simple aplicación de la ley, pues nos compete dilucidar controversias que tocan de cerca el orden social del país, los derechos y las libertades de sus ciudadanos, y la propia estabilidad de nuestro gobierno constitucional. De ahí que no podamos ignorar que las leyes se aprueban con un fin. No debemos reducirlas a la futilidad mediante interpretaciones textuales que trunquen su fuerza y propósito.
Desde hace algún tiempo extendimos estas normas a la interpretación de reglamentos promulgados por las agen-cias administrativas del país. Véanse, e.g.: Monllor v. Soc. de Gananciales, 138 D.P.R. 600, 607 (1995); Consejo Educación Superior v. U.I.A., 120 D.P.R. 224, 243-244 (1987); cf. Ready Mix Concrete v. Comisión Industrial, 92 D.P.R. 37 (1965). Hoy reafirmamos y continuamos esa tradición.
*28 III
A. La Sec. 19 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico dispone que “[s]erá política pública del Estado ... reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social”. L.P.R.A., Tomo 1, ed. 1999, pág. 421. Con esto en mente, la Ley Orgánica de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974, según enmendada, autoriza a la agencia a “[estructurar la política pública en el área de corrección” y a “[formular ... la reglamentación interna necesaria para los programas de diagnóstico, clasificación, tratamiento y rehabilitación de la población correccional”. 4 L.P.R.A. see. 1112(a) y (c). Véase Cruz v. Administración, supra, pág. 4. La Administración de Corrección tiene, sin duda, el deber de administrar un sistema integrado que implante enfoques diversos para ofrecerle un tratamiento individualizado y eficaz a los confinados. 4 L.P.R.A. sec. 1111.
En atención a estos propósitos y a la política pública, tanto constitucional como estatutaria, que inspira el ma-nejo y el tratamiento de los confinados de nuestro país, la Administración de Corrección ha aprobado tres de los re-glamentos que aquí consideramos. En la interpretación in-tegrada de sus disposiciones hallaremos la solución a la controversia ante nuestra consideración.
B. El Reglamento de Procedimientos Disciplinarios para Confinados y Participantes de Programas de Desvío y Comunitarios, Reglamento Núm. 6994 de 29 de junio de 2005 (Reglamento Disciplinario), se promulgó con el fin de propiciar un ambiente de seguridad y orden en las instituciones correccionales del país. Para lograrlo, provee un mecanismo que permite imponer sanciones disciplina- *29 rias a aquellos confinados que infrinjan las normas y los procedimientos de la institución. El Reglamento Discipli-nario establece tanto la estructura del aparato sancionador como las normas sustantivas y los procedimientos que éste habrá de seguir.
Para administrar sus normas, el mencionado reglamento estableció un comité compuesto por tres miembros seleccionados por el Superintendente de cada institución. El comité celebra vistas cuando se le imputa a un confinado la comisión de actos prohibidos de Nivel II o III. Regla 4C del Reglamento Disciplinario, supra. De tratarse de un acto de Nivel I (severidad extrema), el comité no puede ver la querella y debe referirla a un Oficial Examinador de Vistas Disciplinarias. Regla 11C del Reglamento Disciplinario, supra. Todo confinado debe ser orientado sobre las normas institucionales cuando ingresa en la institución. Regla 5 del Reglamento Disciplinario, supra.
Entre las acciones que pueden tomar tanto el Comité como el Oficial Examinador se encuentra recomendar cambios de custodia al Comité de Clasificación y Tratamiento como sanción. Tabla V del Apéndice del Reglamento Disciplinario, supra, pág. 30. Más allá de permitir tal recomendación como medida disciplinaria, en todos los casos de actos prohibidos de Nivel II el Comité tiene la obligación de referir su determinación al Comité de Clasificación y Tratamiento para que este último evalúe si la situación del confinado sancionado amerita cambios en su nivel de custodia. Regla 12B del Reglamento Disciplinario, supra. Igual normativa aplica cuando interviene un Oficial Examinador de Vistas Disciplinarias. Ahora bien, de desestimarse la querella disciplinaria, se retira del expediente del confinado y el Comité de Clasificación y Tratamiento no puede utilizar la información de ésta en la evaluación del caso. Regla 12G del Reglamento Disciplinario, supra.
C. Por otro lado, para lograr la rehabilitación *30 de los confinados y ofrecerles un tratamiento individuali-zado, la Administración de Corrección creó un Comité de Clasificación y Tratamiento que toma todas las decisiones fundamentales relacionadas con el confinado. Manual de Reglas para Crear y Definir Funciones del Comité de Cla-sificación y Tratamiento en las Instituciones Penales, Re-glamento Núm. 2485 de 2 de marzo de 1979, pág. 1 (Manual de Reglas). Su responsabilidad es muy clara: evaluar la situación del confinado para determinar el plan de ac-ción a seguir en cada caso y medir su progreso para garan-tizar su rehabilitación y la seguridad de la sociedad. Para ello, el Comité de Clasificación y Tratamiento evalúa las necesidades, las capacidades, los intereses, las limitaciones y el funcionamiento social del confinado para estructurarle un plan institucional de tratamiento sujeto a evaluaciones periódicas. Regla 2 del Manual de Reglas, supra.
Corrección aprobó, además, el Manual de Clasificación de Confinados, Reglamento Núm. 6067 de 23 de diciembre de 1999 (Manual de Clasificación). Este proclama que el método de clasificación de confinados es esencial para la eficacia de todo sistema correccional. La clasificación de confinados busca separar sistemática y evolutivamente a los confinados en subgrupos, luego de considerar las necesidades de cada individuo y las exigencias y preocupaciones de la sociedad. Este proceso comienza con el ingreso del confinado y termina el día de su excarcelación. Así, el mecanismo sirve para coordinar la custodia física de los confinados con los programas y recursos disponibles dentro del sistema correccional. Se atiende, además, el interés en la protección social, dado que los sujetos más' peligrosos son mantenidos bajo controles mayores.
La jurisdicción del Comité de Clasificación y Tratamiento incluye, entre otras cosas: el tipo de custodia; el alojamiento; las oportunidades de trabajo, estudio o adies- *31 tramiento vocacional, y el tratamiento de condiciones especializadas. Sec. 2.IV.C.1 del Manual de Clasificación, supra. Por otra parte, las revisiones periódicas tienen el fin de determinar si el plan responde a las necesidades del confinado y si deben hacérsele ajustes. Regla 2 del Manual de Reglas, supra. El nivel de custodia de todo confinado en seguridad mínima y mediana se revisa anualmente; mien-tras que los clasificados en máxima son atendidos cada seis meses, tras cumplir un año de su sentencia. Sec. 2.V.D del Manual de Clasificación, supra.
La reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación o en la vivienda asignada. Su fimeión principal es supervisar la adaptación del confinado y prestarle atención a cualquier situación que se pueda presentar. Sec. 7.II del Manual de Clasificación, supra. En ésta se recalca aún más la conducta institucional como reflejo del comportamiento real del confinado durante su reclusión. Aparte de las revisiones rutinarias, se hacen revisiones automáticas no rutinarias cuando, entre otras cosas, el confinado es “convicto” por una violación disciplinaria de Nivel I o II, según definidas por la Administración de Corrección. Sec. 7.III.B del Manual de Clasificación, supra.
No obstante, el Comité de Clasificación y Tratamiento no puede intervenir cuando el Tribunal emite órdenes como resultado de recursos legales que el confinado ha llevado o cuando se toma cualquier acción inmediata con un confinado al amparo de disposiciones del Reglamento Disciplinario. Además, se proscribe la intervención del Comité cuando el confinado solicita ser aislado por razones de seguridad o en aquellas situaciones en que por reglamento se dispone la abstención. Regla 7 del Manual de Reglas, supra. Finalmente, las normas contenidas en el Manual de Reglas se aplican con fines terapéuticos y están matizadas por el propósito estatal de promover la rehabilitación del confinado. Regla 11 del Manual de Reglas, supra.
*32 IV
En su alegato, López Leyro nos presenta una variedad de planteamientos por los cuales solicita que sostengamos el dictamen recurrido.(2) No obstante, su argumento fundamental se relaciona con una cuestión jurisdiccional, por lo que habremos de centrarnos en él. En síntesis, López Le-yro plantea que la Regla 7 del Manual de Reglas, supra, dispone que el Comité de Clasificación no debe intervenir con la evaluación de una situación relacionada con el con-finado cuando éste ya ha sido sancionado según el procedi-miento disciplinario de la agencia. Aduce, por lo tanto, que su reclasificación fue ordenada por un organismo sin auto-ridad para ello. Discrepamos de esa interpretación.
Es cierto que la citada Regla 7 establece que el Comité de Clasificación y Tratamiento no intervendrá en las cir-cunstancias descritas por el confinado. No obstante, un análisis de los reglamentos de la Administración de Co-rrección aplicables a este caso nos convence de que a dicha disposición no se le puede conferir el alcance que propone el recurrido. Veamos.
En 1975, la Administración de Corrección aprobó un Re-glamento para los Procedimientos Disciplinarios, Regla-mento Núm. 1986 de 18 de septiembre de 1975 (Reglamen-to para los Procedimientos), que fue derogado por el actual Reglamento Disciplinario, promulgado en el 2005. Del re-glamento derogado se puede colegir que quien entonces im-ponía sanciones disciplinarias no era un comité de funcio-narios correccionales, sino un Oficial Examinador nombrado por el Administrador de Corrección. Este tenía *33 la potestad para ordenar cambios de custodia por períodos no mayores de tres meses en casos de ofensas menores, o no más de seis meses, en casos graves. La Regla 10 del reglamento derogado disponía, además:
Nada de lo señalado en esta sección sobre sanciones, limi-tará la facultad del Comité de Tratamiento ... para tomar la acción que corresponda, una vez cumplida la sanción im-puesta, en lo que se refiere al tratamiento a adoptarse de ahí en adelante para rehabilitar al cliente. (Enfasis suplido.)
A su vez, el Manual de Reglas —vigente al momento de los hechos y contemporáneo al reglamento derogado que citamos arriba— establece también que el Comité de Cla-sificación y Tratamiento puede considerar situaciones rela-cionadas con el confinado (e.g. cambios de custodia) “al cese de las sanciones disciplinarias” o para “[e] valuación por referi[do] del Oficial Examinador luego de haber sido inter-venido por una querella en Vista Administrativa”. (Énfasis suplido.) Regla 6 del Reglamento para los Procedimientos, supra. Al interpretar las disposiciones vigentes integral-mente, según el mandato del Art. 18 del Código Civil, 31 L.P.R.A. sec. 18, no hay duda de que el Manual de Reglas faculta al Comité de Clasificación y Trátamiento a realizar una evaluación no rutinaria del confinado tras cumplirse la sanción disciplinaria que se le haya impuesto. Véase, además, Sec. 7.III.B del Manual de Clasificación, supra. La Regla 7 se convirtió en una norma ambigua y poco lógica al derogarse el reglamento sobre asuntos disciplinarios, que le era contemporáneo. A pesar de ello, no podemos ignorarla.
No se trata de que un comité obligue a otro o no. La intención de estas disposiciones es mantener separadas las funciones de ambos comités, al evitar que uno intervenga con las determinaciones del otro. Lo que surge de los reglamentos reseñados es un orden de acción. Si bien el Comité de Disciplina Institucional sólo podía recomendar *34 un cambio de custodia como sanción, ello no significa que al exceder su autoridad y ordenar ese cambio el Comité de Clasificación pueda intervenir sin haber llegado el mo-mento para hacerlo.
Concluimos, por lo tanto, que el Comité de Clasificación y Tratamiento de una institución penal puede intervenir con el caso de un confinado, de forma no rutinaria, tras cesar las sanciones impuestas por violación de las normas disciplinarias institucionales. La excepción a la intervención del Comité contenida en el Manual de Reglas tiene un propósito. Su razón de ser original, como hemos confirmado, era proveerles un espacio a las autoridades disciplinarias de la institución para así evitar que otros componentes —fuera del curso apelativo interno— interviniesen con las sanciones impuestas.
Así, cuando el aparato disciplinario disponga sancionar a un confinado con treinta días de segregación, por ejem-plo, el Comité de Clasificación y Tratamiento no podrá in-tervenir y desautorizar tal acción. De igual forma, cuando se aísle a un confinado en determinada institución por ra-zones de seguridad, el Comité tampoco podrá intervenir, pues un cambio del nivel de custodia podría ponerlo en peligro. En estos casos, el único curso a seguir es el dis-puesto para revisar la determinación sobre disciplina, el cual está disponible tanto para el confinado como para las autoridades carcelarias. Con esta interpretación damos efecto a todos los reglamentos aplicables, pues no encon-tramos circunstancias claras que nos permitan inferir una derogación tácita de alguna de las disposiciones pertinentes. Otra cosa sería pretender enmendar regla-mentos debidamente promulgados, cosa que no nos compete hacer.
En el caso de López Leyro, éste fue sancionado el 29 de marzo de 2006. Las sanciones impuestas tenían una dura-ción de 30 días, por lo que vencían el 28 de abril de 2006. Por ende, tras cumplirse ese término, el Comité de Clasifi- *35 catión y Tratamiento tenía autoridad para revisar el plan institucional del confinado. Aunque el 17 de mayo la Ofi-cial de Reconsideración dejó sin efecto casi todas las san-ciones contra López Leyro, no desestimó la querella. Es decir, se sostuvo la “convicción” de López Leyro por violar la prohibición de contrabando. No podemos concluir que al atenuar las sanciones impuestas, la Oficial de Reconside-ración tuvo la intención de eximir de responsabilidad al confinado. Como el Comité de Clasificación y Tratamiento tomó la determinación el 9 de mayo de 2006 —mucho des-pués de haber expirado el término de las sanciones contra López— no cabe duda de que éste podía evaluar el caso y variar la clasificación de la custodia.
V
Por los fundamentos que anteceden, revocamos la Sen-tencia emitida por el Tribunal de Apelaciones y, en consecuencia, sostenemos la determinación de la Administración de Corrección.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Rebollo López disintió sin opinión escrita.

 López Leyro presentó una Moción Solicitando se Dicte Sentencia Declarando Académico el Recurso Apelado, pues ya fue reclasificado a custodia mediana. Le concedimos un término al Procurador General, quien se opuso a la desestimación. Alegó que la controversia aún es justiciable, porque puede recurrir y evadir la revi-sión judicial con respecto del propio confinado. Además, argumentó que existen con-secuencias colaterales que pueden afectarse por un dictamen nuestro, ya que el pro-pio confinado solicita que se considere el tiempo en que estuvo clasificado bajo custodia máxima como si hubiese estado en mediana. El 29 de junio de 2007 dene-gamos la desestimación solicitada. Están presentes circunstancias que nos permiten aplicar las excepciones a la doctrina de academicidad invocadas por el Procurador General. A similar conclusión llegamos en Cruz v. Administración, 164 D.P.R. 341, 347-348 (2005).

 El recurrido parece invocar la protección constitucional contra castigos crue-les e inusitados, pero no nos explica de qué manera el proceso de clasificación puede constituir tal cosa. Además, nos solicita que interpretemos la acción de la Oficial de Reconsideración como determinación institucional de la agencia, cuyo efecto sería privar a otros componentes administrativos de disponer sobre asuntos relacionados con el confinado. También nos plantea que el Comité de Clasificación y Tratamiento no tenía autoridad para intervenir.